# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CATHOLIC LEAGUE FOR
RELIGIOUS AND CIVIL RIGHTS;
RICHARD SONNENSHEIN; VALERIE
MEEHAN,

        *Plaintiffs-Appellants,*

        v.

CITY AND COUNTY OF SAN
FRANCISCO; AARON PESKIN; TOM
AMMIANO, in his official capacity
as a Supervisor, Board of
Supervisors, City and County of
San Francisco,

        *Defendants-Appellees.*

No. 06-17328

D.C. No.
CV-06-02351-MHP

OPINION

Appeal from the United States District Court
for the Northern District of California
Marilyn H. Patel, Senior District Judge, Presiding

Argued and Submitted
December 16, 2009—San Francisco, California

Filed October 22, 2010

Before: Alex Kozinski, Chief Judge, Pamela Ann Rymer,
Andrew J. Kleinfeld, Michael Daly Hawkins,
Sidney R. Thomas, Barry G. Silverman, Susan P. Graber,
M. Margaret McKeown, Richard R. Clifton, Jay S. Bybee
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Kleinfeld;
Concurrence by Judge Silverman;
Partial Concurrence and Partial Dissent by Judge Graber

17357

## COUNSEL

Robert Joseph Muise, Thomas More Law Center, Ann Arbor, Michigan, for the appellants.

Vince Chhabria, Deputy City Attorney, San Francisco, California, for the appellees.

Michael Newdow, Sacramento, California, for amicus curiae Michael Newdow.

Bridget Jeanne Wilson, Rosenstein, Wilson & Dean, P.L.C., San Diego, California, for amicus curiae DignityUSA.

Erwin Chemerinsky, University of California, Irvine, California, for amicus curiae Law Professors Alan Brownstein, Jordan Budd, and Erwin Chemerinsky.

David Blair-Loy, ACLU Foundation of San Diego & Imperial Counties, San Diego, California, for amicus curiae ACLU of San Diego & Imperial Counties.

## OPINION

KLEINFELD, Circuit Judge:

A majority of the court has concluded that the plaintiffs have standing. A separate majority, for differing reasons, affirms the district court's dismissal of the plaintiffs' claim.

Parts I and II of this opinion are joined by Judges THOMAS, SILVERMAN, CLIFTON, BYBEE, and IKUTA.

Part III of this opinion, addressing the merits of the plaintiffs' claim, is a dissent, joined by Judges BYBEE and IKUTA. Five of us, including Chief Judge KOZINSKI and Judges RYMER, HAWKINS, and McKEOWN, conclude that the plaintiffs have no standing, as set forth in Judge GRABER's opinion. Three of us, including Judges THOMAS and CLIFTON, concur in the judgment, concluding that although the plaintiffs do have standing, their claim fails on the merits, as set forth in Judge SILVERMAN's opinion.

## I.   Facts[1]

We address whether Catholics and a Catholic advocacy group in San Francisco may sue the City on account of an official resolution denouncing their church and doctrines of their religion. They may.

Pope Paul III established the Congregation for the Doctrine of the Faith a half millennium ago.[2] It safeguards and promotes Catholic doctrine on faith and morals. In 2003, the Congregation addressed homosexual marriage and adoption, concluding that both were immoral, and that it was the moral duty of Catholics to oppose both. To carry out this doctrinal decision, Cardinal William Joseph Levada directed the Archdiocese of San Francisco that Catholic agencies should not place children for adoption in homosexual households.

San Francisco immediately responded with official hostility. The San Francisco Board of Supervisors adopted the resolution giving rise to this lawsuit. The resolution urges the

---

[1]Because the complaint was dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief could be granted, we take the factual allegations from the complaint to determine whether, if proved, they would establish a claim. *Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 771 (9th Cir. 2006). We therefore state the facts as pleaded.

[2]1542, 468 years ago.

Cardinal to withdraw his instructions; denounces the Cardinal's directive as "meddl[ing]" by a "foreign country"; calls it "hateful," "insulting," and "callous"; and urges the local archbishop and Catholic Charities to "defy" the Cardinal's instructions. Here is Resolution 168-06 in full:

**Resolution urging Cardinal William Levada, in his capacity as head of the Congregation for the Doctrine of the Faith at the Vatican, to withdraw his discriminatory and defamatory directive that Catholic Charities of the Archdiocese of San Francisco stop placing children in need of adoption with homosexual households.**

WHEREAS, It is an insult to all San Franciscans when a foreign country, like the Vatican, meddles with and attempts to negatively influence this great City's existing and established customs and traditions such as the right of same-sex couples to adopt and care for children in need; and

WHEREAS, The statements of Cardinal Levada and the Vatican that "Catholic agencies should not place children for adoption in homosexual households," and "Allowing children to be adopted by persons living in such unions would actually mean doing violence to these children" are absolutely unacceptable to the citizenry of San Francisco; and

WHEREAS, Such hateful and discriminatory rhetoric is both insulting and callous, and shows a level of insensitivity and ignorance which has seldom been encountered by this Board of Supervisors; and

WHEREAS, Same-sex couples are just as qualified to be parents as are heterosexual couples; and

WHEREAS, Cardinal Levada is a decidedly unqualified representative of his former home city, and of the people of San Francisco and the values they hold dear; and

WHEREAS, The Board of Supervisors urges Archbishop Niederauer and the Catholic Charities of the Archdiocese of San Francisco to defy all discriminatory directives of Cardinal Levada; now, therefore, be it

RESOLVED, That the Board of Supervisors urges Cardinal William Levada, in his capacity as head of the Congregation for the Doctrine of the Faith at the Vatican (formerly known as Holy Office of the Inquisition), to withdraw his discriminatory and defamatory directive that Catholic Charities of the Archdiocese of San Francisco stop placing children in need of adoption with homosexual households.[3]

Plaintiffs sued the City, claiming that this official government resolution violates the Establishment Clause. The district court dismissed their lawsuit for failure to state a claim upon which relief could be granted, and we initially affirmed.[4]

---

[3]S.F. Res. No. 168-06 (Mar. 21, 2006), *available at* http:// www.sfbos.org/ftp/uploadedfiles/bdsupvrs/resolutions06/r0168-06.pdf.

[4]*Catholic League for Religious and Civil Rights v. San Francisco*, 567 F.3d 595 (9th Cir. 2009), *reh'g en banc granted* 586 F.3d 1166 (9th Cir. 2009).

We then voted to rehear the case en banc, and now affirm the district court's dismissal on differing grounds.

## II.   Standing

The complaint alleges that plaintiffs are a Catholic civil rights organization and two devout Catholics who live in San Francisco. They aver that the resolution conveys a government message of disapproval and hostility toward their religious beliefs. It "sends a clear message," they plead, "that they are outsiders, not full members of the political community." They allege that they have been injured by "misuse of the instruments of government to criticize, demean and attack their religion and religious beliefs, thereby chilling their access to the government." The individual plaintiffs aver that they "will curtail their activities to lessen their contact" with the city and county government, and the two members of the Board of Supervisors sued because of the resolution.

After raising the question of standing sua sponte, we asked the parties for letter briefs addressing it. The City and County conceded standing, arguing that "the individual plaintiffs have successfully pleaded standing, having alleged that they are members of the community who have had contact with the resolution and have suffered spiritual harm as a result." Were the result otherwise, the municipality concedes, a resolution declaring Catholicism to be the official religion of the municipality would be effectively unchallengeable. The municipality also concedes that the Catholic League has "associational standing."

"At bottom, 'the gist of the question of standing' is whether petitioners have 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.' "[5] Had a Protestant in Pasa-

---

[5]*See Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

dena brought this suit, he would not have had standing. Catholics in San Francisco, on the other hand, have sufficient interest, so that well-established standing doctrine entitles them to litigate whether an anti-Catholic resolution violates the Establishment Clause. Standing, or the lack of it, may be intertwined with whether the complaint states a claim upon which relief can be granted, but it is not the same thing.[6] Standing is not about who wins the lawsuit; it is about who is allowed to have their case heard in court. It would be outrageous if the government of San Francisco could condemn the religion of its Catholic citizens, yet those citizens could not defend themselves in court against their government's preferment of other religious views.

Nevertheless, some of us have dissented on standing, so we address the issue. The standing question, in plain English, is whether adherents to a religion have standing to challenge an official condemnation by their government of their religious views, and official urging by their government that their local religious representative defy their church. Their "personal stake" assures the "concrete adverseness" required. "Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community. Disapproval sends the opposite message."[7] Plaintiffs aver that not only does the resolution make them feel like second-class citizens, but that their participation in the political community will be chilled by the City's hostility to their church and their religion.

[1] The constitutional requirement of standing has three elements: (1) the plaintiff must have suffered an injury-in-fact

---

[6]*Cf. Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1244 (2010); *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 511-12 (2006).

[7]*Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring); *see also Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 595 (1989) (adopting Justice O'Connor's rationale in *Lynch*).

— that is, a concrete and particularized invasion of a legally protected interest that is actual or imminent, not conjectural or hypothetical; (2) the injury must be causally connected — that is, fairly traceable — to the challenged action of the defendant and not the result of the independent action of a third party not before the court; and (3) it must be likely and not merely speculative that the injury will be redressed by a favorable decision by the court.[8] "The concept of a 'concrete' injury is particularly elusive in the Establishment Clause context . . . because the Establishment Clause is primarily aimed at protecting non-economic interests of a spiritual, as opposed to a physical or pecuniary, nature."[9]

It is, of course, incumbent upon the courts to apply standing doctrine neutrally, so that it does not become a vehicle for allowing claims by favored litigants and disallowing disfavored claimants from even getting their claims considered. Without neutrality, the courts themselves can become accessories to unconstitutional endorsement or disparagement. Standing is emphatically not a doctrine for shutting the courthouse door to those whose causes we do not like. Nor can standing analysis, which prevents a claim from being adjudicated for lack of jurisdiction, be used to disguise merits analysis, which determines whether a claim is one for which relief can be granted if factually true.

**[2]** Standing was adequate for jurisdiction in Establishment Clause cases in the Supreme Court in the following contexts: prayer at a football game,[10] a crèche in a county courthouse[11] or public park,[12] the Ten Commandments displayed on the

---

[8]*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 475-76 (1982).

[9]*Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246, 1250 (9th Cir. 2007).

[10]*Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 313-14 (2000).

[11]*Cnty. of Allegheny v. ACLU*, 492 U.S. 573 (1989).

[12]*Lynch v. Donnelly*, 465 U.S. 668 (1984).

grounds of a state capitol[13] or at a courthouse,[14] a cross display
at a national park,[15] school prayer,[16] a moment of silence at
school,[17] Bible reading at public school,[18] and a religious invo-
cation at a graduation.[19] No one was made to pray, or to pray
in someone else's church, or to support someone else's
church, or limited in how they prayed on their own, or made
to worship, or prohibited from worshiping, in any of these
cases. The Court treated standing (and therefore the concrete-
ness element of standing) as sufficient in all of these cases,
even though nothing was affected but the religious or irreli-
gious sentiments of the plaintiffs.[20]

---

[13]*Van Orden v. Perry*, 545 U.S. 677 (2005).

[14]*McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844 (2005).

[15]*Salazar v. Buono*, 130 S. Ct. 1803 (2010).

[16]*Engel v. Vitale*, 370 U.S. 421 (1962).

[17]*Wallace v. Jaffree*, 472 U.S. 38 (1985).

[18]*Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203 (1963).

[19]*Lee v. Weisman*, 505 U.S. 577 (1992).

[20]Judge Graber's argument appears to be that since this case does not
involve a challenge to a religious display on government property, a reli-
gious exercise at a public ceremony, or a "specific governmental policy or
statutory provision," there is no standing. There is not a single standing
case that limits Establishment Clause standing to these three categories.
Most of the cases fall into them because American governments have typi-
cally been sympathetic to religion rather than hostile to it. Establishment
Clause challenges, because of this typical governmental sympathy for reli-
gion, tend to challenge governmental endorsement. The Supreme Court,
though, has carefully linked rejection of endorsements to rejection of con-
demnations in virtually every discussion of the subject. *See, e.g.*, *Church
of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532
(1992) ("[T]he First Amendment forbids an official purpose to disapprove
of a particular religion . . . ."). Moreover, an official resolution of the City
of San Francisco is indeed a "case[ ] involving a specific governmental
policy," condemning, in this case, the Catholic Church. The distinction
Judge Graber draws between a governmental display and a government's
official resolution cuts against her view. A symbol such as a crèche on the
city hall lawn is ambiguous. It may mean that the government endorses
Christianity, or it may mean that the government merely wishes to show
respect and friendship for Christianity. The resolution at issue, like a sym-

**[3]** We have concluded that standing was established in cases involving displaying crosses on government land,[21] removing a cross from a city seal,[22] disciplining physicians who performed surgery without blood transfusions in a lawsuit by Jehovah's Witnesses,[23] including the words "under God" in the Pledge of Allegiance,[24] and contracting with the Boy Scouts to administer a city recreational facility.[25] The harm to the plaintiffs in those cases was spiritual or psychological harm.[26] That is the harm plaintiffs claim here. If we

---

bol, conveys a message, but unlike a symbol, the message is unambiguous. Judge Graber's opinion would ignore San Francisco's plain denunciation of the Catholic Church because it is unaccompanied by symbolic public art. The opinion also ignores binding Supreme Court precedent on government speech: "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech. . . . This does not mean that there are no restraints on government speech. For example, government speech must comport with the Establishment Clause." *Pleasant Grove City v. Summum*, 129 S. Ct. 1125, 1131-32 (2009).

[21]*Buono v. Norton*, 371 F.3d 543 (9th Cir. 2004); *Separation of Church & State Comm. v. City of Eugene*, 93 F.3d 617, 619 n.2 (9th Cir. 1996) (per curiam).

[22]*Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246, 1250 (9th Cir. 2007).

[23]*Graham v. Deukmejian*, 713 F.2d 518, 519 (9th Cir. 1983).

[24]*Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007 (9th Cir. 2010).

[25]*Barnes-Wallace v. City of San Diego*, 530 F.3d 776 (9th Cir. 2008).

[26]Judge Graber cites many, many standing cases and faults us for not discussing all of them to the same extent. The reason why all need not be patiently explicated is that not a single one of Judge Graber's cited cases involves a government condemnation of a particular church or religion. The attempt to tease out of the rhetoric explaining the holdings in other, quite different, factual circumstances fails because the language in every case explained a different result. True, there are so many Establishment Clause standing cases that the language (as opposed to the holdings) in some furnishes ammunition for Judge Graber's view. *Newdow v. LeFevre* upholds standing to challenge federal statutes requiring "In God We Trust" on currency, but not the federal statute making "In God We Trust" the national motto. 598 F.3d 638, 642 (9th Cir. 2010). *Newdow v. Rio Linda Union School District* has dicta that a parent and child lacked stand-

conclude that plaintiffs in the case before us have standing, we need not decide whether those cases retain their vitality or are overruled, because our conclusion would be consistent with them. But if we reject standing for plaintiffs in this case, then those cases must somehow be distinguished convincingly (a difficult task), or overruled.

The leading Supreme Court Establishment Clause case for the absence of Establishment Clause standing is *Valley Forge Christian College v. Americans United for Separation of Church and State*.[27] The government had conveyed surplus property to a religious college, for free, subject to a condition subsequent requiring use for thirty years solely as an educational institution.[28] The plaintiffs sued because the college was avowedly and plainly a sectarian Christian institution that would operate for sectarian Christian purposes. The Court held that Americans United lacked standing, not only for a

---

ing to challenge the federal statute adding "under God" to the pledge of allegiance, but holds that they had standing to challenge the California law requiring the pledge's recitation in the schools even though no child was required to recite it. 597 F.3d 1007, 1016 (9th Cir. 2010). Judge Graber's stretch from federal statutes regarding traditional patriotic formulas that include vague and general religiosity, to a local ordinance condemning the church and religious views of some of the municipality's residents, takes the explanatory language of these cases too far. Additionally, Judge Graber argues that a one-page Eighth Circuit per curiam opinion, *Flora v. White*, is "indistinguishable" from this case. 692 F.2d 53 (8th Cir. 1982) (per curiam). Hardly. The Eighth Circuit held that the plaintiffs lacked standing to challenge a provision in the Arkansas Constitution making atheists incapable of holding public office or to testify as a witness, where the plaintiffs had no plans to do either. *Id.* at 54. Their being offended because they were atheists was analogized to the plaintiffs offended but not affected in *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464 (1982). *See Flora*, 692 F.2d at 54. Unlike either of these cases, the plaintiffs here are not suing on the mere principle of disagreeing with San Francisco, but because of that city's direct attack and disparagement of their religion.

[27]454 U.S. 464 (1982).

[28]*Id.* at 468.

taxpayers suit under *Flast v. Cohen*,[29] but also as individuals and a group affected by government action respecting an establishment of religion.[30] The reason they lacked the concrete injury necessary for standing was that, regardless of whether the government action violated the Establishment Clause, they had no concrete injury beyond the offense to their desire to have the government conform to the Constitution.[31] "They fail[ed] to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees."[32] These plaintiffs were like the Protestants in Pasadena suing San Francisco over its anti-Catholic resolution.

[4] One has to read the whole *Valley Forge* sentence quoted, and not stop at "psychological consequence," to understand it. A "psychological consequence" does not suffice as concrete harm where it is produced merely by "observation of conduct with which one disagrees." But it does constitute concrete harm where the "psychological consequence" is produced by government condemnation of one's own religion or endorsement of another's in one's own community. For example, in the school prayer and football game cases, nothing bad happened to the students except a psychological feeling of being excluded. Likewise in the crèche and Ten Commandments cases, nothing happened to the non-Christians, or to people who disagreed with the Ten Commandments or their religious basis, except psychological consequences. What distinguishes the cases is that in *Valley Forge*, the psychological consequence was merely disagreement with the government, but in the others, for which the Court identified a sufficiently concrete injury, the psychologi-

[29]392 U.S. 83 (1968).

[30]*Valley Forge*, 454 U.S. at 479-80, 485-86.

[31]*Id.* at 485-86.

[32]*Id.* at 485.

cal consequence was exclusion or denigration on a religious basis within the political community.[33]

**[5]** Plaintiffs allege that they are directly stigmatized by San Francisco's actions. They allege that the stigmatizing resolution leaves them feeling like second-class citizens of the San Francisco political community, and expresses to the citizenry of San Francisco that they are. The cause of the plain-

---

[33]Judge Graber argues that standing is appropriate in the religious display cases, but not this case of condemnation of a religion, because those who challenge a religious display have frequent or regular contact with it and are harmed because they cannot freely use public areas. This distinction cuts the other way, however, as explained above. Living in a city that condemns one's religion is a daily experience of contact with a government that officially condemns one's religion. A plaintiff's having visual contact with a cross is immaterial, and would not raise a question if it were merely in a painting in the city art museum, because a reasonable person would not infer a government's position on a religion from the painting. The "contact" that matters is in the mind — acquisition of the knowledge that the government endorses (or condemns) a religion. An official government condemnation of a religion unambiguously and inescapably conveys knowledge of that condemnation. Judge Graber's notion that the public display cases involve restriction on movement relies on a false factual proposition. In none of the religious display cases is there any law prohibiting free use of public areas by those who are not adherents to the religion. The nonadherents simply feel uncomfortable in the presence of a display endorsing someone else's religion. There is no principled basis for assiduously addressing that discomfort, yet treating as trivial the discomfort of those whose religion is condemned by their government. The plaintiffs are as affected by what the San Francisco government has done — condemning their religion — as an atheist would be if the San Francisco government erected a giant cross on top of its biggest hill, on which he happened to live and which he would be walking past on the way to work. The government cannot constitutionally endorse a religion by erecting the cross; nor, analogously, can it condemn religion by erecting a gigantic sign on city hall of a cross with a line through it: a "no Christianity" sign with the design of a "no smoking" sign. The Board's resolution accomplishes the same thing as the aforementioned sign, but even more plainly and unambiguously. Symbols endorsed or adopted by a government are often ambiguous, but the words in this resolution are not. Consequently, this is an easier and more direct case for standing than any of the religious-symbolism cases cited by Judge Graber.

tiffs' injury here is not speculative: it is the resolution itself. Plaintiffs allege that their "Sacred Scripture" "presents homosexual acts as acts of grave depravity," and that "Catholic tradition has always declared that homosexual acts are intrinsically disordered." Plaintiffs believe as part of their religion that "Catholics have an obligation to state clearly the immoral nature of homosexual unions so as to safeguard public morality, and above all, to avoid exposing young people to erroneous ideas about sexuality and marriage. Clear and emphatic opposition to homosexual unions is a duty of all Catholics." San Francisco directly disparages these religious beliefs through its resolution by calling them "hateful and discriminatory," "insulting and callous," and "insensitiv[e] and ignoran[t]."

**[6]** The concreteness of injury is sufficiently pleaded here because plaintiffs aver that: (1) they live in San Francisco; (2) they are Catholics; (3) they have come in contact with the resolution; (4) the resolution conveys a government message of disapproval and hostility toward their religious beliefs; that (5) "sends a clear message" "that they are outsiders, not full members of the political community"; (6) "thereby chilling their access to the government"; and (7) forcing them to curtail their political activities to lessen their contact with defendants.

**[7]** Standing also requires redressability, that is, that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[34] Plaintiffs seek a declaratory judgment that the resolution is unconstitutional, and nominal damages for the violation of their rights. By declaring the resolution unconstitutional, the official act of the government becomes null and void.[35] Even more important, a

---

[34]*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotation marks omitted).

[35]*See, e.g.*, *Powell v. McCormack*, 395 U.S. 486, 506 (1969) (" 'Especially is it competent and proper for this court to consider whether

declaratory judgment would communicate to the people of the plaintiffs' community that their government is constitutionally prohibited from condemning the plaintiffs' religion, and that any such condemnation is itself to be condemned. This would reaffirm the fundamental principle that

> [t]he basic purpose of the religion clause of the First Amendment is to promote and assure the fullest possible scope of religious liberty and tolerance for all and to nurture the conditions which secure the best hope of attainment of that end.
>
> The fullest realization of true religious liberty requires that government neither engage in nor compel religious practices, that it effect no favoritism among sects or between religion and nonreligion, *and that it work deterrence of no religious belief.*[36]

## III. Merits

I dissent with regard to the merits of the Board's resolution.

"The Establishment Clause prohibits government from making adherence to a religion relevant in any way to a person's standing in the political community."[37] Government

---

its (the legislature's) proceedings are in conformity with the Constitution and laws, because, living under a written constitution, no branch or department of the government is supreme; and it is the province and duty of the judicial department to determine in cases regularly brought before them, whether the powers of any branch of the government, and even those of the legislature in the enactment of laws, have been exercised in conformity to the Constitution; and if they have not, to treat their acts as null and void.' " (quoting "language which time has not dimmed" from *Kilbourn v. Thompson*, 103 U.S. 168, 199 (1880))).

[36]*Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 305 (1963) (Goldberg, J., concurring) (emphasis added), *quoted with approval in Larson v. Valente*, 456 U.S. 228, 246 (1982).

[37]*Lynch v. Donnelly*, 465 U.S. 668, 687 (1984) (O'Connor, J., concurring); *see also Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 595 (1989) (adopting Justice O'Connor's rationale in *Lynch*).

runs afoul of the Establishment Clause through "endorsement or disapproval of religion. Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community. Disapproval sends the opposite message."[38] Plaintiffs complain here of just such governmental disparagement of their religion.

We have not found another Establishment Clause case brought by people whose religion was directly condemned by their government. Though there have been lapses, as with Mormons and Jehovah's Witnesses, tradition even more than law has generally restrained our national, state, and local governments from expressing condemnation or disrespect for anyone's religion. George Washington set the tone for our governmental relationship to religion even before the First Amendment was ratified, in his 1790 expression of goodwill to the Hebrew Congregation in Newport, Rhode Island:

> All possess alike liberty of conscience and immunities of citizenship. It is now no more that toleration is spoken of, as if it was by the indulgence of one class of people, that another enjoyed the exercise of their inherent natural rights. For happily the government of the United States, which gives to bigotry no sanction, to persecution no assistance, requires only that they who live under its protection should demean themselves as good citizens, in giving it on all occasions their effectual support.[39]

The only recent Court decision on government hostility to a particular religion that we have found is the free exercise decision of *Church of the Lukumi Babalu Aye, Inc. v. City of*

---

[38]*Lynch*, 465 U.S. at 688 (O'Connor, J., concurring).

[39]*Critical Documents of Jewish History* 3 (Ronald H. Isaacs & Kerry M. Olitzky eds. 1995).

*Hialeah*, where the Court notes that its Establishment Clause cases "have often stated the principle that the First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general."[40] That case, along with many other opinions of the Court, stands for the principle that government has no legitimate role under the Establishment Clause in judging the religious beliefs of the people — either by praise or denunciation.[41] This principle requires that we nullify San Francisco's governmental condemnation of Catholic doctrine.

Though much criticized,[42] *Lemon v. Kurtzman*[43] remains

---

[40]*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1992) (citing six cases).

[41]*See, e.g.*, *Lynch*, 465 U.S. at 673 ("Nor does the Constitution require complete separation of church and state; *it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any*." (emphasis added)).

[42]*See, e.g.*, *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 720 (1994) (O'Connor, J., concurring) (warning that "the bad test may drive out the good. Rather than taking the opportunity to derive narrower, more precise tests from the case law, courts tend to continually try to patch up the broad test, making it more and more amorphous and distorted. This, I am afraid, has happened with *Lemon*"); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 399 (1993) (Scalia, J., concurring) (lamenting that "[l]ike some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried, *Lemon* stalks our Establishment Clause jurisprudence once again, frightening the little children and school attorneys . . . ." And detailing how "[o]ver the years . . . no fewer than five of the [then] sitting Justices have, in their own opinions, personally driven pencils through the creature's heart (the author of today's opinion repeatedly), and a sixth has joined an opinion doing so"); *Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 669 (1989) (Kennedy, concurring in part) (expressing his view "that the endorsement test is flawed in its fundamentals and unworkable in practice"); *Comm. for Pub. Ed. v. Regan*, 444 U.S. 646, 671 (1980) (Stevens, J. dissenting) (explaining that the Court should abandon "the sisyphean task of trying to patch together the 'blurred, indistinct, and variable barrier' described in *Lemon*")

[43]403 U.S. 602 (1971).

controlling on Establishment Clause violations, subject to subsequent emendations as the "endorsement" and "neutrality" principles have developed.[44] Under *Lemon*, government action must have a secular purpose, "its principal or primary effect must be one that neither advances nor inhibits religion," and it "must not foster excessive entanglement with religion."[45]

The municipality argues that its purpose was not to condemn Catholicism, but rather to foster equal treatment of people who are gay and lesbian. That is indeed a legitimate purpose, but we would not have this case before us if that were all that the resolution said. The San Francisco government would face no colorable Establishment Clause challenge had they limited their resolution to its fourth "whereas," that "[s]ame sex couples are just as qualified to be parents as heterosexual couples." San Francisco is entitled to take that position and express it even though Catholics may disagree as a matter of religious faith. But the title paragraph, the other five "whereas" clauses, and the "resolved" language are all about the Catholic Church, not same-sex couples.

The municipality argues that any reasonable recipient of its message would also be familiar with its forty-one other resolutions condemning discrimination against homosexuals and anti-homosexual speech in Russia,[46] Germany,[47] Florida,[48] Ala-

---

[44]*See Lamb's Chapel*, 508 U.S. at 395 n.7 (stating, in response to Justice Scalia's assertion that *Lemon* was a "ghoul in a late-night horror movie," that "there is a proper way to inter an established decision and *Lemon*, however frightening it might be to some, has not been overruled").

[45]*Lemon*, 403 U.S. at 612-13.

[46]S.F. Res. No. 364-06 (June 13, 2006), *available at* http://www.sfbos.org/ftp/uploadedfiles/bdsupvrs/resolutions06/r0364-06.pdf.

[47]S.F. Res. No. 220-00 (Mar. 13, 2000), *available at* http://www.sfbos.org/ftp/uploadedfiles/bdsupvrs/resolutions00/r0220-00.pdf.

[48]S.F. Res. No. 73-05 (Jan. 25, 2005), *available at* http://www.sfbos.org/ftp/uploadedfiles/bdsupvrs/resolutions05/r0073-05.pdf.

bama,[49] by a senator from another state,[50] by various celebrities,[51] and by a football team.[52] The municipality claims that these show that its concern is homosexuals, not Catholicism, and that any inference of anti-Catholicism is decisively rebutted because anyone would know that the councilman who introduced the resolution is Catholic. The argument seems bizarre. Why would anyone know the personal religious faith of each city councilman? Or be familiar with all the resolutions of their municipal government, not just the one attacking their church? And why should the underlying secular motive inferable from other government actions cure an expressed anti-Catholic purpose in the action challenged? Regardless of what the underlying motivation may be for the various individuals on the city council, a court must, in deciding whether a government action violates the Establishment Clause, read the words of the government enactment.[53] If the zoning board pro-

---

[49]S.F. Res. No. 234-99; *see Am. Family Ass'n v. City & Cnty. of San Francisco*, 277 F.3d 1114, 1119 (9th Cir. 2002).

[50]S.F. Res. No. 308-03 (May 6, 2003), *available at* http://www.sfbos.org/ftp/uploadedfiles/bdsupvrs/resolutions03/r0308-03.pdf.

[51]*See, e.g.*, S.F. Res. No. 199-00 (Mar. 6, 2000), *available at* http://www.sfbos.org/ftp/uploadedfiles/bdsupvrs/resolutions00/r0199-00.pdf.

[52]S.F. Res. No. 454-05 (June 14, 2005), *available at* http://www.sfbos.org/ftp/uploadedfiles/bdsupvrs/resolutions05/r0454-05.pdf.

[53]Judge Silverman suggests that the resolution should be read in the context of San Francisco's history of promoting gay rights and supporting the rights of same-sex couples. A strong city policy of favoring gay rights, though, does not justify official attacks on religion. The San Francisco government used the group version of an ad hominem argument. Instead of a resolution simply favoring same-sex adoption and criticizing the arguments against it, the resolution attacked the religion of those against it. A secular motive for smearing anti-Catholic graffiti on a cathedral would not erase the anti-Catholic message conveyed. The Board of Supervisors went out of its way to characterize Catholicism as coming from a "foreign country[:] the Vatican," its teachings as "hateful," and implicitly compared modern-day Catholic officials to the Inquisition. These are traditional anti-

hibited all synagogues and mosques from operating within the city limits, the action would not be saved even by a legislative history that persuasively demonstrated a secular motive of avoiding strife between Jews and Muslims. "[O]fficial objective emerges from readily discoverable fact, without any judicial psychoanalysis of a drafter's heart of hearts."[54] "[T]he absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect."[55]

The resolution also must satisfy the second prong of the *Lemon* test, that its "principal or primary effect must be one that neither advances nor inhibits religion . . . ."[56] Here, the argument seems to be that the resolution has no effect at all, let alone a "principal or primary" one, because it is merely an ineffectual expression of the Board of Supervisors' sentiment and not a compulsory regulation of behavior. That argument cannot stand because of the extensive Establishment Clause jurisprudence where government, arguably with similar ineffectuality, endorses religion, and the mere endorsement is deemed unconstitutional.[57]

---

Catholic tropes employed for centuries by anti-Catholic bigots. *See, e.g.*, Thomas E. Watson, *Rome's Law, Or Our's — Which?*, The Jeffersonian, Sept. 7, 1916, at 4 (using the same rhetorical device as the Board of Supervisors, Tom Watson, the Populist supporter of the Ku Klux Klan, characterized Catholic religious convictions as "laws of [a] foreigner [that] are absolutely antagonistic to ours. . . . The Pope's is the only church that is foreign; the only church whose laws antagonize democracy and republican institutions . . . ; the only church whose theology teaches murder, and whose literature is so obscene that she savagely prosecutes [those] who expose it").

[54]*McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 862 (2005).

[55]*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991).

[56]*Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971).

[57]*See, e.g.*, *McCreary Cnty.*, 545 U.S. at 844 (display of Ten Commandments); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000) (prayer

The "effect" prong of the *Lemon* test "asks whether, irrespective of the government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval."[58] That is to say, a mere message of disapproval, even in the absence of any coercion, suffices for an Establishment Clause violation under *Lemon*. If the government action conveys a message of disapproval of religion, then it violates the Establishment Clause.[59] The "message" in the resolution, unlike, say, the message that might be inferred from some symbolic display, is explicit: a Catholic doctrine duly communicated by the part of the Catholic church in charge of clarifying doctrine is "hateful," "defamatory," "insulting," "callous," and "discriminatory," showing "insensitivity and ignorance," the Catholic Church is a hateful foreign meddler in San Francisco's affairs, the Catholic Church ought to "withdraw" its religious directive, and the local archbishop should defy his superior's directive. This is indeed a "message of . . . disapproval." And that is all it takes for it to be unconstitutional.[60]

---

before football game); *Lee v. Weisman*, 505 U.S. 577 (1992) (religious invocation at school graduation); *Cnty. of Allegheny v. ACLU*, 492 U.S. 573 (1989) (crèche display at a courthouse); *Wallace v. Jaffree*, 472 U.S. 38 (1985) (moment of silence or voluntary prayer at school); *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203 (1963) (Bible reading at school); *Engel v. Vitale*, 370 U.S. 421 (1962) (prayer at school); *Buono v. Norton*, 371 F.3d 543 (9th Cir. 2004) (cross on public land); *Separation of Church & State Comm. v. City of Eugene*, 93 F.3d 617 (9th Cir. 1996) (same); *Graham v. Deukmejian*, 713 F.2d 518 (9th Cir. 1983) (disciplining physicians who performed surgery in accord with religious beliefs); *see also Pleasant Grove City v. Summum*, 129 S. Ct. 1125, 1139 (2009) (Stevens, J., concurring) (suggesting that even though government expression is not impeded by the Free Speech Clause, "government speakers are bound by the Constitution's other proscriptions, including those supplied by the Establishment and Equal Protection Clauses").

[58]*Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring) (Justice O'Connor's rationale was later adopted by the Court in *Wallace*, 472 U.S. at 56).

[59]*Id.*

[60]*Id.*

As for entanglement, the resolution explicitly entangles itself in church governance. The City would entangle itself with judicial hierarchy, albeit not unconstitutionally, by urging a district judge to defy the court of appeals. And San Francisco entangles itself with the Catholic hierarchy when it urges the local archbishop to defy the cardinal. It is a dramatic entanglement to resolve that the Cardinal "as head of the Congregation for the Doctrine of the Faith" should withdraw his directive. The Catholic Church, like the myriad other religions that have adherents in San Francisco, is entitled to develop and propagate its faith without assistance and direction from government.[61] If the faith leads to actions contrary to San Francisco policy, like not placing children for adoption with homosexual couples, the city may abjure use of its institutions to place children, but it may not entangle itself with development of Catholic religious doctrine.[62] The half-millennium-old

---

[61]*See Cnty. of Allegheny*, 492 U.S. at 590 ("[T]oday [the Establishment and Free Exercise Clauses] are recognized as guaranteeing religious liberty and equality to the infidel, the atheist, or the adherent of a non-Christian faith such as Islam or Judaism. It is settled law that no government official in this Nation may violate these fundamental constitutional rights regarding matters of conscience." (internal quotation marks and citation omitted)).

[62]Though Henry II and Thomas Becket, as well as Henry VIII and Thomas More, explored the consequences of governmental direction to Church leaders and religious followers respecting their conformance with their Church's directives, we Americans, since long before *Lemon*, have rejected what Madison called "intermeddl[ing]" in church affairs. *Lemon*, 403 U.S. at 635 (Douglas, J., concurring) (quoting James Madison, *Memorial and Remonstrance Against Religious Assessments* para. 11 (1785)); *see also* James Madison, Address to the Convention of Virginia (June 12, 1788), *reprinted in* 3 *The Debates in the Several State Conventions, On the Adoption of the Federal Constitution, as Recommended by the General Convention at Philadelphia, in 1787* 330 (Jonathan Elliot ed., 1888) ("There is not a shadow of right in the general government to intermeddle with religion. Its least interference with it, would be a most flagrant usurpation."). In contrast to such intermeddling, the high school case about "Ave Maria" at graduation cited by Judge Silverman, *Nurre v. Whitehead*, 580 F.3d 1087 (9th Cir. 2009), did not involve any attack on religion, just an avoidance of what might have appeared to be a governmental endorsement of religion. *Id.* at 1098-99.

Congregation for the Doctrine of the Faith is entitled, under our Constitution, to develop religious doctrine free of governmental interference.

*Lemon* requires government to satisfy all three prongs to avoid an Establishment Clause violation.[63] Even if we were to conclude that San Francisco satisfied one or two of them, it would not satisfy all three. "What is crucial is that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion."[64] Messages of endorsement or disapproval "make religion relevant, in reality or public perception, to status in the political community."[65] It is an "established principle that the government must pursue a course of complete neutrality toward religion."[66] The "[Establishment] Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.' "[67]

The Establishment Clause might arguably have been limited, long ago, to prohibiting something like the Church of England, where taxes support the church and the government appoints its head, the Archbishop of Canterbury. Or the clause might have been limited to laws imposing fines for failure to attend church at proper times.[68] But it has not been so limited.

---

[63]*Edwards v. Aguillard*, 482 U.S. 578, 583 (1987) ("State action violates the Establishment Clause if it fails to satisfy any of [the *Lemon* test] prongs.").

[64]*Lynch*, 465 U.S. at 692 (O'Connor, J., concurring).

[65]*Id.*

[66]*Wallace v. Jaffree*, 472 U.S. 38, 60 (1985).

[67]*Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 574 (1989) (quoting *Lynch*, 465 U.S. at 687 (O'Connor, J., concurring)).

[68]*See, e.g.*, *The Laws and Liberties of Massachusetts* 20 (Max Farrand ed., 1929) (1648) (requiring church attendance on the "Lords days" and any other days "as are to be generally kept by the appointment of Authoritie," with anyone who violated this law being required to "forfeit for his absence from everie such publick meeting five shillings").

The Establishment Clause as it has developed may be violated even by government action that is no more than expression of a sentiment, as by displays of religious symbols on government property. None of these violations compel anyone to do anything or refrain from anything, but they are the usual subjects of Establishment Clause prohibition. The Court has assiduously avoided limiting its doctrines to endorsement, by saying "endorsement or disapproval,"[69] so disapproval is as much a violation as endorsement. For the government to resolve officially that "Catholic doctrine is wrong," is as plainly violative of the Establishment Clause as for the government to resolve that "Catholic doctrine is right."

No practical or fair reading could construe the Establishment Clause as prohibiting only government endorsement and not government condemnation of religion. Though it is hard to imagine that government condemnation of the Catholic Church would generate a pogrom against Catholics as it might at another time or for a religion with fewer and more defenseless adherents, the risk of serious consequences cannot be disregarded.[70] Vandals might be emboldened by knowledge that their government agrees that the Catholic Church is hateful and discriminatory. Parishioners might be concerned about driving their car to Mass for fear that it might be keyed in the parking lot. Zoning officials might be emboldened to deny variances and building permits on grounds they might not

---

[69]*See Cnty. of Allegheny*, 492 U.S. at 620; *Sch. Dist. of Grand Rapids v. Ball*, 473 U.S. 373, 389 (1985); *Wallace*, 472 U.S. at 61.

[70]San Francisco is quite a metropolitan city, with many people coming from other countries than our own. Some of those countries persecute their religious minorities — including Christians. *See Lolong v. Gonzales*, 400 F.3d 1215, 1217-18, 1221-22 (9th Cir. 2005) (describing how Christians are a persecuted minority in Indonesia), *rev'd*, 484 F.3d 1173 (9th Cir. 2007) (en banc). An official resolution by a government in the United States condemning a Christian religious denomination would not put American Catholics in fear of a pogrom, but might put immigrants from some other countries in fear of what a government hostile to their church might someday do to them.

apply to other churches. Catholic city employees might fear for their promotions if they show too much religiosity, as by coming to work on Ash Wednesday with ash crosses on their foreheads. There are very good reasons why the Constitution directs government to stay out of religious matters.

Our Founding Fathers were well aware of the strife in Europe during the Thirty Years War, and in England in the English Revolution, over religion. They put together a nation of Protestants of various disagreeing sects, Catholics, and Jews, by excluding government from religion. The exclusion was not anticlerical, and did not invite government hostility to any church. Our revolution, unlike the French, Mexican, or Russian revolutions, had no element of anticlericalism. Our Bill of Rights established freedom of religion, not hostility to or establishment of any religion.

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts.
>
> . . . .
>
> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens by word or act their faith therein.[71]

Yet the San Francisco Board of Supervisors took upon itself authority to "prescribe what shall be orthodox" in Catholic doctrine. Government cannot constitutionally prescribe a religious orthodoxy and condemn heresy on homosexuality, or

---

[71]*West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638, 642 (1942).

anything else. "[N]either Pagan nor Mahometan, nor Jew, ought to be excluded from the civil rights of the commonwealth because of his religion."[72] America allows both loyalty to faith and first-class citizenship.

## IV.   Conclusion

**[8]** Although three of us would reverse, a majority of this court concludes that we should affirm, either on standing grounds or on the merits. Accordingly, the judgment of the district court is **AFFIRMED**.

SILVERMAN, Circuit Judge, with whom THOMAS and CLIFTON, Circuit Judges, join, concurring:

I agree with Judge Kleinfeld that the plaintiffs have standing to sue, and therefore join Parts I and II of his opinion. However, we part company when it comes to the merits of the plaintiffs' claims. In my opinion, the district court correctly dismissed the plaintiffs' lawsuit because duly-elected government officials have the right to speak out in their official capacities on matters of secular concern to their constituents, even if their statements offend the religious feelings of some of their other constituents. The key here is that the resolution in question had a primarily secular purpose and effect and addressed a matter of indisputably civic concern.

Government speech or conduct violates the Establishment Clause's neutrality-only requirement when it: (1) has a predominantly religious purpose; (2) has a principal or primary effect of advancing or inhibiting religion; or (3) fosters excessive entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971). We have previously applied the tripar-

---

[72]John Locke, *A Letter Concerning Toleration* 56 (James H. Tully ed., Hackett Publ'g Co. 1983) (1689).

tite *Lemon* test to governmental expressions of alleged religious hostility. *See Am. Family Ass'n v. City & County of S.F.*, 277 F.3d 1114, 1121 (9th Cir. 2002); *see also Vernon v. City of L.A.*, 27 F.3d 1385, 1396 (9th Cir. 1994). The resolution in this case satisfies each of *Lemon*'s three prongs.

There is no denying that marriage and adoption are secular issues regulated by state law, even though they can (but do not necessarily) involve religious ceremonies and traditions. The same-sex marriage debate surely has religious significance to many, but it is also a hot-button political issue of considerable secular interest to the defendants' constituents at large. The defendants passed their March 2006 resolution in direct response and contemporaneous to Cardinal Levada's March 2006 directive. The title of the resolution refers explicitly to Cardinal Levada's directive to local Catholic charities to "stop placing children in need of adoption in homosexual households." Its stated purpose is to "urge[ ] Cardinal William Levada . . . to withdraw [t]his . . . directive." The reasons given are purely secular, not theological. For example, the resolution contains nothing like, "The Church has misread the Bible," or "*Our* God approves of same-sex marriage."

I agree with the district court that under *Lemon*'s first prong (the purpose prong), an "objective observer" who is "presumed to be familiar with the history of the government's actions and competent to learn what history has to show" would conclude that the defendants acted with a predominantly secular purpose, i.e., to promote equal rights for same-sex couples in adoption and to place the greatest number of children possible with qualified families. Moreover, San Francisco has a well-known and lengthy history of promoting gay rights. *See Catholic League v. City & County of S.F.*, 464 F. Supp. 2d 938, 946 & n.1 (taking judicial notice of other San Francisco resolutions promoting the rights of same-sex couples). A reasonable observer would consider the resolution in the context of both this history and the Catholic Church's unabashed efforts to frustrate same-sex adoption in San Fran-

cisco, the defendants' political bailiwick. In light of this context, such an observer would conclude that the primary purpose behind the resolution was secular — to promote same-sex adoption.

Under *Lemon*'s second prong (the effect prong), an objectively reasonable observer familiar with the history of the government practice at issue here would conclude that the primary effect of the resolution was to promote same-sex adoption. *See Am. Family*, 277 F.3d at 1122. Read as a whole, *see id.*, the resolution's primary message is that "same-sex couples are just as qualified to be parents as are heterosexual couples" and that placing children in homosexual households does not do violence to them. An objectively reasonable observer would conclude, as they would in the context of the purpose prong, that both San Francisco's history of promoting gay rights and the timing of the defendants' resolution, incendiary though it may be, is aimed at expressing the defendants' position on the secular issue of same-sex adoption.

Finally, under *Lemon*'s third prong (the entanglement prong), this resolution does not excessively entangle the defendants with religion. It was an isolated, non-binding expression of the Board of Supervisors' opinion on a secular matter, which the plaintiffs have not alleged even potentially interfered with the inner workings of the Catholic Church. This type of one-off entreaty does not violate *Lemon*'s third prong; "[a]dministrative entanglement typically involves comprehensive, discriminating, and continuing surveillance of religion." *Vernon*, 27 F.3d at 1399. To like effect is *Nurre v. Whitehead*, 580 F.3d 1087 (9th Cir. 2009), holding that a school district's single request that a student not play "Ave Maria" at graduation, because of multiple complaints about religious music, did not constitute excessive entanglement with religion.

In *American Family*, we concluded that the Board of Supervisors did not violate the Establishment Clause by passing

resolutions similar to those at issue here. The resolutions in *American Family* criticized a religious political coalition for its moral position on homosexuality, assailed the scientific and sociological bases for the coalition's position, and urged secular television stations not to support the coalition's message of intolerance. *See Am. Family*, 277 F.3d at 1119-20. One of the coalition's ads, placed in the San Francisco Chronicle, proclaimed that "God abhors any form of sexual sin," including homosexuality. *Id.* at 1119. The Board passed the resolutions in response to that ad, and others. *Id.* at 1119-20.

The plaintiffs would have us distinguish the resolution in this case from the one in *American Family* on the grounds that the Board directed this resolution toward a religious entity rather than a political one. But the mere fact that a resolution calls out a church or a clergyman cannot carry the day. Otherwise, the Establishment Clause would gag secular officials from responding to religious entities even when those entities have chosen to enter the secular fray.

We would have a different case on our hands had the defendants called upon Cardinal Levada to recant his views on transubstantiation, or had urged Orthodox Jews to abandon the laws of kashrut, or Mormons their taboo of alcohol. Those matters of religious dogma are not within the secular arena in the way that same-sex marriage and adoption are. The speech here concerns a controversial public issue that affects the civic lives of the citizens of San Francisco, religious and non-religious alike. I would not construe the First Amendment to prohibit elected officials from speaking out, in their official capacities, on matters of such clearly civil import, even if their speech is insolent, stupid, or worse. A church has every right to take a firm moral position on secular issues, but it has no right to prevent public officials from criticizing its position on those secular issues — especially when one of its clergy fires the first salvo.

I would affirm.

GRABER, Circuit Judge, joined by KOZINSKI, Chief Judge, and RYMER, HAWKINS, and McKEOWN, Circuit Judges, dissenting on the issue of jurisdiction but concurring in the judgment:

Plaintiffs Catholic League for Religious and Civil Rights ("Catholic League"), Dr. Richard Sonnenshein, and Valerie Meehan brought this 42 U.S.C. § 1983 action against Defendants City and County of San Francisco, San Francisco Board of Supervisors President Aaron Peskin, and Supervisor Tom Ammiano, challenging their enactment of Resolution of March 21, 2006, No. 168-06. Plaintiffs argue that the resolution violates the Establishment Clause of the First Amendment by impermissibly attacking Plaintiffs' religion, Catholicism. The resolution concerns a Catholic cardinal and his directive to Catholic Charities CYO of San Francisco ("Catholic Charities"), a non-profit provider of social services, on the topic of adoption by same-sex couples. I would not reach the merits of this dispute. Instead, I would hold that we lack jurisdiction over this case because Plaintiffs lack Article III standing.

The doctrine of standing requires that Plaintiffs demonstrate a concrete and particularized injury caused by the passage of Resolution No. 168-06. But the resolution plainly applies (albeit in a non-binding, hortatory way) only to persons and entities other than Plaintiffs. Plaintiffs do not allege any form of concrete and particularized injury resulting from the resolution; they allege only a deep and genuine offense. It is a bedrock principle of federal courts' limited jurisdiction that a person's deep and genuine offense to a defendant's actions, without more, generally does not suffice to confer standing. Here, Plaintiffs do not allege more.

The doctrine of standing not only ensures robust litigation by interested parties, but also protects the interests of those potential plaintiffs who have chosen, for whatever reason, not to bring suit. Plaintiffs' allegations suggest that several enti-

ties and individuals—including Cardinal Levada, Archbishop Niederauer, and Catholic Charities—likely have standing. Just as much as we must resolve all cases within our jurisdiction, we also must respect the decision by those persons and entities not to sue.

Because a majority of the en banc panel holds that we have jurisdiction, I dissent from that portion of the disposition. But, because I agree with the judgment affirming the district court's dismissal of the action, I concur in the judgment.

## FACTUAL AND PROCEDURAL HISTORY

Catholic Charities is an agency of the San Francisco Archdiocese of the Catholic Church. It operates as a non-profit provider of social services in the Bay Area. Until 2006, Catholic Charities' services included placing children with adoptive parents.

In March 2006, Cardinal William Joseph Levada, the head of the Congregation for the Doctrine of the Faith, issued a directive to Catholic Charities. The directive instructed Catholic Charities to stop placing children in need of adoption with same-sex couples. The San Francisco Board of Supervisors responded by unanimously adopting a non-binding resolution:

> [Resolution urging Cardinal Levada to withdraw his directive to Catholic Charities forbidding the placement of children in need of adoption with same-sex couples]
>
> **Resolution urging Cardinal William Levada, in his capacity as head of the Congregation for the Doctrine of the Faith at the Vatican, to withdraw his discriminatory and defamatory directive that Catholic Charities of the Archdiocese of San Francisco stop placing children in need of adoption with homosexual households.**

WHEREAS, It is an insult to all San Franciscans when a foreign country, like the Vatican, meddles with and attempts to negatively influence this great City's existing and established customs and traditions such as the right of same-sex couples to adopt and care for children in need; and

WHEREAS, The statements of Cardinal Levada and the Vatican that "Catholic agencies should not place children for adoption in homosexual households," and "Allowing children to be adopted by persons living in such unions would actually mean doing violence to these children" are absolutely unacceptable to the citizenry of San Francisco; and

WHEREAS, Such hateful and discriminatory rhetoric is both insulting and callous, and shows a level of insensitivity and ignorance which has seldom been encountered by this Board of Supervisors; and

WHEREAS, Same-sex couples are just as qualified to be parents as are heterosexual couples; and

WHEREAS, Cardinal Levada is a decidedly unqualified representative of his former home city, and of the people of San Francisco and the values they hold dear; and

WHEREAS, The Board of Supervisors urges Archbishop Niederauer and the Catholic Charities of the Archdiocese of San Francisco to defy all discriminatory directives of Cardinal Levada; now, therefore, be it

RESOLVED, That the Board of Supervisors urges Cardinal William Levada, in his capacity as head of the Congregation for the Doctrine of the Faith at the Vatican (formerly known as Holy Office of the

> Inquisition), to withdraw his discriminatory and defamatory directive that Catholic Charities of the Archdiocese of San Francisco stop placing children in need of adoption with homosexual households.

Resolution of Mar. 21, 2006, No. 168-06 (bracketed sentence in original). According to the complaint, Defendants also threatened to withhold funding from Catholic Charities if that organization refused to place children with same-sex couples.

Soon thereafter, Plaintiffs brought this action. Plaintiffs allege that the resolution violates the Establishment Clause of the First Amendment. They seek "nominal damages, a declaration that this anti-Catholic resolution is unconstitutional, and a permanent injunction enjoining this and other official resolutions, pronouncements, or declarations against Catholics and their religious beliefs." In the complaint, Plaintiffs identify themselves and their injuries as follows:

> Plaintiff Catholic League is the nation's largest Catholic civil rights organization. Founded in 1973, the Catholic League defends the right of Catholics— lay and clergy alike—to participate in American public life without defamation or discrimination. The Catholic League has approximately 6,000 members who reside in the City and County of San Francisco. The Catholic League and its members object to, and have been injured by, the anti-Catholic resolution adopted by Defendants. Defendants' anti-Catholic resolution attacks the deeply held religious beliefs of Catholics, conveys the impermissible, state-sponsored message of disapproval of and hostility toward the Catholic religion, and sends a clear message to Catholic League, its members, and others who are adherents to the Catholic faith that they are outsiders, not full members of the political community.

Plaintiff Dr. Richard Sonnenshein is a resident of the City and County of San Francisco. He is a devout Catholic, and he objects to and has been injured by the anti-Catholic resolution adopted by Defendants. Defendants' anti-Catholic resolution attacks Plaintiff Sonnenshein's deeply held religious beliefs, conveys the impermissible, state-sponsored message of disapproval of and hostility toward the Catholic religion, and sends a clear message to Plaintiff Sonnenshein and others who are adherents to the Catholic faith that they are outsiders, not full members of the political community. Plaintiff Sonnenshein is a member of the Catholic League.

Plaintiff Valerie Meehan is a resident of the City and County of San Francisco. She is a third-generation San Franciscan and a devout Catholic. Plaintiff Meehan objects to and has been injured by the anti-Catholic resolution adopted by Defendants. Defendants' anti-Catholic resolution attacks Plaintiff Meehan's deeply held religious beliefs, conveys the impermissible, state-sponsored message of disapproval of and hostility toward the Catholic religion, and sends a clear message to Plaintiff Meehan and others who are adherents to the Catholic faith that they are outsiders, not full members of the political community.

Plaintiffs Sonnenshein and Meehan have had direct contact with and have been injured by the offending anti-Catholic resolution, which stigmatizes Plaintiffs on account of their religious beliefs and conveys a message to them that they are outsiders, not full members of the political community. Plaintiffs Sonnenshein and Meehan, who are citizens and municipal taxpayers of Defendant City and County of San Francisco, have been injured by the abuse of government authority and the misuse of the instru-

ments of government to criticize, demean, and attack their religion and religious beliefs, thereby chilling their access to the government. As a result of Defendants' anti-Catholic resolution, Plaintiffs Sonnenshein and Meehan will curtail their activities to lessen their contact with Defendants, thereby causing further harm. Plaintiff Catholic League, through its members, has been similarly injured and harmed by Defendants' anti-Catholic resolution.

(Paragraph numbering omitted.)

Defendants filed a motion to dismiss for failure to state a claim. Defendants argued, on the merits, that the resolution does not violate the Establishment Clause. The district court agreed. In a published opinion, the district court held that the resolution does not violate the Establishment Clause and, therefore, dismissed the case. *Catholic League for Religious & Civil Rights v. City of San Francisco*, 464 F. Supp. 2d 938 (N.D. Cal. 2006).

Plaintiffs timely appealed. In a published opinion, a three-judge panel of our court unanimously affirmed, agreeing with the district court that the resolution does not violate the Establishment Clause. *Catholic League for Religious & Civil Rights v. City of San Francisco*, 567 F.3d 595, 608 (9th Cir. 2009). We granted rehearing en banc. 586 F.3d 1166 (9th Cir. 2009).

The parties never raised the issue of Plaintiffs' Article III standing, and neither the district court nor the panel addressed the issue. Shortly before the date of our en banc oral argument, we sua sponte directed the parties to file simultaneous briefs on the issue of Article III standing and to be prepared to discuss the issue at oral argument.

## STANDARD OF REVIEW

We review de novo the district court's dismissal for failure to state a claim. *Barker v. Riverside Cnty. Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009).

DISCUSSION

Before reaching the merits of any case, including an Establishment Clause challenge, we must ensure that the plaintiff has Article III standing. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004). "The question of standing is not subject to waiver . . . : We are required to address the issue even if the courts below have not passed on it, and even if the parties fail to raise the issue before us." *United States v. Hays*, 515 U.S. 737, 742 (1995) (brackets and internal quotation marks omitted). "This obligation to notice defects in . . . subject-matter jurisdiction assumes a special importance when a constitutional question is presented. In such cases we have strictly adhered to the standing requirements . . . ." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541-42 (1986).[1]

A.   *Article III Standing in Establishment Clause Cases*

The Article III standing requirements "are familiar: The plaintiff must show that the conduct of which he complains has caused him to suffer an 'injury in fact' that a favorable judgment will redress." *Newdow*, 542 U.S. at 12 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Familiar though the requirements may be, the Supreme Court also has cautioned that standing is not a precise doctrine. *See id.* at 11 ("The standing requirement is born partly of 'an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.' " (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)); *Valley Forge Christian Coll. v. Ams. United*

---

[1]For those reasons, it is incorrect to state that Defendants have "conceded standing." Maj. op. at 17365. As the majority elsewhere recognizes, a party may not "concede" that we have subject matter jurisdiction. (A majority of the en banc panel has voted for Judge Kleinfeld's opinion with respect to standing but not with respect to other Parts. Because I cite only those Parts of Judge Kleinfeld's opinion that command a majority, I refer to his opinion throughout as the majority opinion.)

*for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) (stating that "the concept of 'Art. III standing' has not been defined with complete consistency . . . [and] cannot be reduced to a one-sentence or one-paragraph definition").

That imprecision is manifest in the Establishment Clause context. Courts regularly have noted that it can be difficult to determine whether an Establishment Clause plaintiff has alleged an "injury in fact" for purposes of Article III standing. *See, e.g.*, *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 489-90 (2d Cir. 2009) ("[S]o far the [Supreme] Court has announced no reliable and handy principles of analysis. . . . Lower courts are left to find a threshold for injury and determine somewhat arbitrarily whether that threshold has been reached. . . . In short, there is uncertainty concerning how to apply the injury in fact requirement in the Establishment Clause context."), *cert. denied*, 130 S. Ct. 1688 (2010); *Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246, 1250 (9th Cir. 2007) ("The concept of a 'concrete' injury is particularly elusive in the Establishment Clause context."); *Suhre v. Haywood Cnty.*, 131 F.3d 1083, 1085 (4th Cir. 1997) (same); *Murray v. City of Austin*, 947 F.2d 147, 151 (5th Cir. 1991) (same); *Saladin v. City of Milledgeville*, 812 F.2d 687, 691 (11th Cir. 1987) (same). The difficulty stems, at least in part, from the nature of the asserted "injury in fact." Unlike most other types of cases, in which the plaintiff suffers a physical injury or a pecuniary loss, the plaintiff in an Establishment Clause case usually does not suffer those types of harm. *Vasquez*, 487 F.3d at 1250-51; *Suhre*, 131 F.3d at 1086. Instead, the plaintiff in an Establishment Clause case typically asserts only that the government's action has caused an injury in fact to "non-economic interests of a spiritual, as opposed to a physical or pecuniary, nature." *Vasquez*, 487 F.3d at 1250-51; *see Suhre*, 131 F.3d at 1086 (holding that " 'the spiritual, value-laden beliefs of the plaintiffs' are often most directly affected by an alleged establishment of religion" (quoting *ACLU of Ga. v. Rabun Cnty. Chamber of Commerce, Inc.*, 698 F.2d 1098, 1102 (11th Cir. 1983) (per curiam))).

The Supreme Court has made clear that this sort of harm—injury to interests of a spiritual nature—can suffice to establish an "injury in fact" for purposes of Article III standing. *See, e.g.*, *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154 (1970) ("A person or a family may have a spiritual stake in First Amendment values sufficient to give standing to raise issues concerning the Establishment Clause . . . ."). But it is equally clear that an asserted injury of that nature does not grant the plaintiff carte blanche to federal-court resolution of Establishment Clause challenges. *Valley Forge*, 454 U.S. at 485.

Even though the injury is spiritual in nature, the injury also must be *direct* and *personal* to the particular plaintiff. " 'The essence of the standing inquiry is whether the [plaintiffs] have alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' " *Larson v. Valente*, 456 U.S. 228, 238-39 (1982) *(quoting Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 72 (1978)). "[B]ut standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy." *Valley Forge*, 454 U.S. at 486. "[A]t an irreducible minimum, Art. III requires the [plaintiff] to 'show that he *personally* has suffered some actual or threatened injury . . . .' " *Id.* at 472 (emphasis added) (quoting *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99 (1979)); *see also Lujan*, 504 U.S. at 560 & n.1 (holding that an "injury in fact" "must affect the plaintiff in a *personal and individual* way" (emphasis added)). A plaintiff " 'must allege facts showing that he is himself adversely affected . . . [in part] to put the decision as to whether review will be sought in the hands of those who have a *direct* stake in the outcome.' " *Valley Forge*, 454 U.S. at 473 (emphasis added) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972)). The requirement of a direct and personal injury in part "reflects a due regard

for the autonomy of those persons likely to be most directly affected by a judicial order." *Id.*

In *Valley Forge*, 454 U.S. at 467-68, the plaintiffs brought an Establishment Clause challenge to a transfer of land from the federal government to a religious organization. The plaintiffs had never visited the land in question, nor did they have any other direct connection to it. The Court held that the plaintiffs "fail[ed] to identify any personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees. That is not an injury sufficient to confer standing under Art. III . . . ." *Id.* at 485 (emphasis omitted).

The plaintiffs in *Valley Forge* maintained that the Court's earlier cases had held "that any person asserting an Establishment Clause violation possesses a 'spiritual stake' sufficient to confer standing." *Id.* at 486 n.22. The Court disagreed and illustrated the plaintiffs' error by reference to two cases raising challenges to required Bible readings in public schools: *School District v. Schempp*, 374 U.S. 203 (1963); and *Doremus v. Board of Education*, 342 U.S. 429 (1952). In *Doremus*, the Court lacked jurisdiction because the student had graduated but, in *Schempp*, the student was still in school, so the Court held that the plaintiffs had standing. *Compare Doremus*, 342 U.S. at 432-33, *with Schempp*, 374 U.S. at 224 n.9. In *Valley Forge*, the Court explained: "The plaintiffs in *Schempp* had standing, not because their complaint rested on the Establishment Clause—for as *Doremus* demonstrated, that is insufficient—but because impressionable schoolchildren were subjected to unwelcome religious exercises or were forced to assume special burdens to avoid them." *Valley Forge*, 454 U.S. at 487 n.22; *see also Schempp*, 374 U.S. at 224 n.9 ("The parties here are school children and their parents, who are directly affected by the laws and practices against which their complaints are directed.").

The courts have developed a substantial body of case law interpreting *Valley Forge*'s holding that the plaintiff must allege a direct and personal injury other than "the psychological consequence presumably produced by observation of conduct with which one disagrees."[2] 454 U.S. at 485. Below, I describe three general categories of cases. First, and most directly relevant here, I describe cases involving a specific governmental policy or statutory provision, in which the plaintiff challenges the policy or provision directly. As discussed below, the cases have held that a plaintiff has standing to challenge the policy or provision only if the plaintiff proves that the enactment applies directly to him or her. A generalized objection to the policy or provision is insufficient.

The requirement that the plaintiff demonstrate that the policy or provision applies directly to him or her is consistent with the courts' approach in the second and third categories of cases. In religious exercise cases, the courts have addressed situations in which the plaintiff challenges some form of religious invocation at a public gathering or ceremony. The courts have held that a plaintiff has standing to challenge a religious exercise only if the plaintiff is directly subjected to the unwelcome exercise. Similarly, in the religious display cases, the courts have addressed situations in which the plaintiff challenges a religious display on public property. The courts have held that a plaintiff has standing to challenge a religious display only if the plaintiff has altered his or her behavior or if the plaintiff has direct and unwelcome contact with the display.

---

[2]We have rejected the proposition that the plaintiffs in *Valley Forge* lacked standing because their offense was grounded in ideological, rather than religious, beliefs. *Buono v. Norton*, 371 F.3d 543, 547 (9th Cir. 2004), *on appeal after remand*, 527 F.3d 758 (9th Cir. 2008), *rev'd and remanded on other grounds*, 130 S. Ct. 1803 (2010). We held that, in Valley Forge, the Supreme Court "drew a distinction between abstract grievances and personal injuries, not ideological and religious beliefs." *Id.* Significantly, all cases interpreting *Valley Forge*, discussed *infra*, have rejected the proposition that abstract harm to religious beliefs alone is sufficient to confer standing.

Those principles—established through longstanding and consistent analysis by the Supreme Court, by us, and by our sister circuits—constitute an important source of law and guide our analysis here. Accordingly, I cannot understand the majority's assertion that my opinion requires that these "cases must somehow be distinguished . . . or overruled." Maj. op. at 17370. In no way do I suggest that these cases do not "retain their vitality" or that they "are overruled." *Id.* To the contrary, I extract from these cases certain principles of law that we must apply here, to this case. Accordingly, my analysis of standing is entirely consistent with the existing body of law. It is the majority opinion that fails to explain how a conclusion of standing in this case is consistent with that substantial body of law—a body of law discussed in detail in this opinion but referenced only in passing, in list form, in his.

Furthermore, the list in majority opinion identifies the constitutional issues that either the Supreme Court or we have addressed in an earlier case. Maj. op. at 17367-68. The majority then concludes that, because the courts have addressed those issues, surely a finding of standing in this case is consistent with those cases. *See id.* at 17369-70 ("If we conclude that plaintiffs in the case before us have standing, we need not decide whether those cases retain their vitality or are overruled, because our conclusion would be consistent with them."). But standing focuses on *the plaintiff*, not on *the issue*. That this case raises an interesting constitutional issue similar to issues addressed in previous cases is, quite simply, beside the point.[3] The relevant questions are whether the plaintiff has

---

[3]I could not agree more that "[s]tanding is emphatically not a doctrine for shutting the courthouse door to those whose causes we do not like." Maj. op. at 17367. Indeed, at least some of those who join this opinion might have been inclined to agree that the resolution violates the Establishment Clause, had a proper plaintiff brought this case. Equally important, however, standing is emphatically not a doctrine for opening the courthouse door to everyone who wishes us to resolve their questions of constitutional law—however academically interesting those questions may be.

suffered a cognizable injury and whether that injury is redressable. It is to those relevant questions that I now turn.

### 1. *Governmental Policies or Statutory Provisions*

In many cases, including recent ones, plaintiffs have raised Establishment Clause challenges to specific governmental policies or statutory provisions. *See, e.g.*, *Larson*, 456 U.S. at 230-34 (state statute imposing registration and reporting requirements on "religious organizations"); *Newdow v. Lefevre*, 598 F.3d 638, 641 (9th Cir. 2010) (federal statute declaring the national motto "In God We Trust"); *Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1012-13 (9th Cir. 2010) (federal statute codifying the pledge of allegiance as including the words "under God"); *Chaplaincy of Full Gospel Churches v. U.S. Navy (In re Navy Chaplaincy)*, 534 F.3d 756, 758-59 (D.C. Cir. 2008) (federal policy concerning navy chaplains' retirement benefits), *cert. denied*, 129 S. Ct. 1918 (2009); *Graham v. Deukmejian*, 713 F.2d 518, 519 (9th Cir. 1983) (state policy requiring blood transfusions during certain surgeries, contrary to religious beliefs of Jehovah's Witnesses); *Flora v. White*, 692 F.2d 53, 54 (8th Cir. 1982) (per curiam) (state constitutional provision requiring certain officeholders and witnesses to profess their belief in the existence of "a God"); *see also Am. Family Ass'n v. City of San Francisco*, 277 F.3d 1114, 1119-20 (9th Cir. 2002) (municipal board of supervisors' formal disapproval of an advertising campaign by religious groups);[4] *cf. Smelt v. Cnty. of Orange*,

---

[4]In *American Family*, we did not discuss standing but, rather, asserted jurisdiction over the Establishment Clause issue sub silentio. Sub silentio holdings on jurisdiction occupy an interesting place in our jurisprudence. We cannot ignore such holdings. *See E. Enters. v. Apfel*, 524 U.S. 498, 522 (1998) (" 'While we are not bound by previous exercises of jurisdiction in cases in which our power to act was not questioned but was passed *sub silentio*, neither should we disregard the implications of an exercise of judicial authority assumed to be proper' in previous cases." (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 307 (1962))). But their import necessarily is difficult to assess because, by definition, there is no

447 F.3d 673, 676-77 (9th Cir. 2006) (challenge to federal statute concerning same-sex marriages on other constitutional grounds). The courts have held that, if the statute or policy applies to the plaintiff in a concrete manner, then the plaintiff has standing. *See Larson*, 456 U.S. at 241 ("The threatened application of [the statutory provision] to the Church surely amounts to a distinct and palpable injury to [the plaintiffs]: It disables them from soliciting contributions in the State of Minnesota unless the Church complies with registration and reporting requirements that are hardly *de minimis*."); *Graham*, 713 F.2d at 519 ("The Witnesses must show that they have suffered injury, or that future injury is threatened, as a result of the defendants' conduct. The Witnesses have so alleged, claiming that blood transfusions are contrary to their religious beliefs and that California's actions threaten to discourage physicians from performing certain operations without such transfusions." (citation omitted)). If the plaintiffs are not subject to the challenged provision, however, they lack the requisite particularized harm. *See Lefevre*, 598 F.3d at 643 (holding that the plaintiff lacked standing to challenge the statute declaring the national motto "In God We Trust" because the allegation that, because of the statute, the plaintiff is a "political outsider" and suffers "a stigmatic injury" "is insufficient to confer standing"); *Rio Linda*, 597 F.3d at 1016 (holding that the plaintiff lacked standing to challenge the federal statute codifying the pledge of allegiance as including the words "under God" because the plaintiff sustained no personal injury where "nothing in the Pledge [or the statute codifying it] actu-

---

reasoning in the opinion that we may apply to the case at hand. In any event, no difficulty is presented here, because the facts of *American Family* plainly establish that the standing requirements I discuss in text were met in that case (which may explain our silence on the issue). For instance, I take judicial notice of the complaint in *American Family*. The plaintiffs there alleged the government's policy statement was directed specifically at the plaintiffs and that the statement prevented the plaintiffs from placing certain television advertisements that they otherwise would have placed. In short, the policy statement applied directly to the plaintiffs.

ally requires anyone to recite it"); *In re Navy Chaplaincy*, 534 F.3d at 758 (holding that navy chaplain plaintiffs could not challenge the U.S. Navy's alleged policy of discrimination in its retirement system, in favor of Catholic navy chaplains, because the plaintiffs themselves had not suffered discrimination); *Flora*, 692 F.2d at 54 (holding that atheist plaintiffs lacked standing to challenge a discriminatory state constitutional provision because the provision had never been applied to the plaintiffs); *see also Smelt*, 447 F.3d at 683-86 (holding that plaintiff same-sex couple lacked standing to challenge federal statute denying benefits to married same-sex couples, because the plaintiffs were not married under state law and had not been denied any federal benefits or rights).

## 2.  *Religious Exercise Cases*

In a second category, plaintiffs have brought Establishment Clause challenges to some form of religious invocation at a public gathering or ceremony. *See, e.g.*, *Schempp*, 374 U.S. at 205-06 (daily scripture readings in public school); *Doremus*, 342 U.S. at 430 (same); *Rio Linda*, 597 F.3d at 1012-13 (recitations of the pledge of allegiance in public school); *Pelphrey v. Cobb Cnty.*, 547 F.3d 1263, 1266 (11th Cir. 2008) (invocations at beginning of county planning meetings); *Doe v. Tangipahoa Parish Sch. Bd.*, 494 F.3d 494, 496-99 (5th Cir. 2007) (en banc) (invocations at school board meetings); *Doe v. Sch. Dist. of Norfolk*, 340 F.3d 605, 607-08 (8th Cir. 2003) (scheduled invocation and benediction at high school graduation); *Doe v. Sch. Bd. of Ouachita Parish*, 274 F.3d 289, 291 (5th Cir. 2001) (prayers at public school); *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 791 (9th Cir. 1999) (en banc) (student prayers at high school graduations); *see also Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 294 (2000) (student prayers at high school football games); *Lee v. Weisman*, 505 U.S. 577, 580-83 (1992) (prayers at graduation ceremonies); *Wallace v. Jaffree*, 472 U.S. 38, 40-42 (1985) (school prayer and meditation); *Engel v. Vitale*, 370 U.S. 421,

422-23 (1962) (school prayer).[5] In *Valley Forge*, 454 U.S. at 487 n.22, the Court examined *Doremus* and *Schempp* and explained that a plaintiff has standing if he or she has actually been "subjected to unwelcome religious exercises." Accordingly, a plaintiff who did not attend an event at which the religious invocation occurred had never actually been "subjected to unwelcome religious exercises," *id.*, and therefore lacked standing. *See Tangipahoa Parish*, 494 F.3d at 497-98 (holding that the plaintiffs lack standing because "there is no evidentiary proof that any of the [plaintiffs] ever attended a school board session at which a prayer . . . was recited"); *see also Madison*, 177 F.3d at 797 (holding that a parent plaintiff did not have standing where "she does not claim that she will attend another graduation ceremony in the future"). When plaintiffs regularly attend events at which an invocation occurs, however, the plaintiffs have standing because they have been subjected to unwelcome religious exercises. *See Pelphrey*, 547 F.3d at 1279-80 (regular attendee at county planning commission meetings); *Ouachita Parish*, 274 F.3d at 292 (students at public schools exposed to daily prayer).

The Eighth Circuit considered an interesting combination of these two extremes in *Norfolk*. There, the public school announced to the student body, at a mandatory graduation rehearsal, that the impending graduation ceremony would include an invocation and benediction. *Norfolk*, 340 F.3d at 607. After the ACLU and a parent expressed concern, the school dropped the invocation and benediction from the scheduled ceremony. *Id.* During the ceremony, however, a member of the school board interrupted his speech to lead the

---

[5]In the four cases following the "see also" indicator, I list the cases in which the Supreme Court did not discuss standing but, rather, asserted jurisdiction over the Establishment Clause issue sub silentio. As explained above, *supra* note 4, sub silentio holdings on jurisdiction can present interesting challenges. But, here, there are no difficulties because the facts of the listed cases plainly establish that the standing requirements I discuss in text were met in those cases (which may explain the Court's silence on the issue of standing).

audience through a recitation of the Lord's Prayer. *Id.* at 608. An offended student and his mother sued the school district and certain members of the school board. *Id.*

The court had "little trouble" concluding that the plaintiffs had standing to challenge the actions of the School Board member who read the prayer (and the other defendants, on the theory that they were complicit). *Id.* at 609. After all, the plaintiffs "were subjected to an unwelcome religious recitation at a school function." *Id.* But whether the plaintiffs had standing to challenge the school's "past policy of allowing prayer at graduation ceremonies[ ] present[ed] a much closer issue." *Id.* The court acknowledged that the school's announcement to the students at the mandatory rehearsal that, consistent with the school's tradition, the graduation ceremony would include an invocation and benediction constituted some personal contact with an endorsement of religion. *Id.* at 609-10. Nevertheless, the court concluded that the plaintiffs lacked standing to pursue this claim, both because the plaintiffs' contact with endorsement was insufficient and because the plaintiffs did not allege that the past policy caused them any particularized injury. *Id.*

### 3. *Religious Display Cases*

In a legion of cases, plaintiffs have challenged religious displays. *See, e.g.*, *Lefevre*, 598 F.3d at 640 (national motto "In God We Trust" on the nation's coins and currency); *ACLU of Ky. v. Grayson Cnty.*, 591 F.3d 837, 840-41 (6th Cir. 2010) (Ten Commandments in county courthouse); *Cooper*, 577 F.3d at 484 (religious displays at post office); *Green v. Haskell Cnty. Bd. of Comm'rs*, 568 F.3d 784, 787-88 (10th Cir. 2009) (Ten Commandments on courthouse green), *cert. denied*, 130 S. Ct. 1687 (2010); *Caldwell v. Caldwell*, 545 F.3d 1126, 1128 (9th Cir. 2008) (religious statements on public university's website), *cert. denied*, 129 S. Ct. 1617 (2009); *Barnes-Wallace v. City of San Diego*, 530 F.3d 776, 783 (9th Cir. 2008) (order) (Boy Scout symbols in public park), *cert.*

*denied*, 130 S. Ct. 2401 (2010); *Vasquez*, 487 F.3d at 1247-48 (removal of cross on county seal); *O'Connor v. Washburn Univ.*, 416 F.3d 1216, 1218-19 (10th Cir. 2005) (statue of Roman Catholic bishop displayed at public university in outdoor art show); *Books v. Elkhart Cnty.*, 401 F.3d 857, 858 (7th Cir. 2005) (Ten Commandments on public property); *ACLU of Ohio Found., Inc. v. Ashbrook*, 375 F.3d 484, 487 (6th Cir. 2004) (Ten Commandments on courtroom wall); *Buono*, 371 F.3d at 544 (cross on a hill); *ACLU Neb. Found. v. City of Plattsmouth*, 358 F.3d 1020, 1024-25 (8th Cir. 2004) (Ten Commandments in public park), *adopted in relevant part*, 419 F.3d 772, 775 n.4 (8th Cir. 2005) (en banc); *Glassroth v. Moore*, 335 F.3d 1282, 1284 (11th Cir. 2003) (Ten Commandments monument at Alabama State Judicial Building); *Adland v. Russ*, 307 F.3d 471, 474-75 (6th Cir. 2002) (Ten Commandments on public property); *ACLU-NJ v. Twp. of Wall*, 246 F.3d 258, 260 (3d Cir. 2001) (holiday display on public property); *Books v. City of Elkhart*, 235 F.3d 292, 294 (7th Cir. 2000) (Ten Commandments on front lawn of municipal building); *Suhre*, 131 F.3d at 1084 (Ten Commandments in county courthouse); *Separation of Church & State Comm. v. City of Eugene*, 93 F.3d 617, 618 (9th Cir. 1996) (per curiam) (51-foot Latin cross on butte in city park); *Doe v. Cnty. of Montgomery*, 41 F.3d 1156, 1157 (7th Cir. 1994) (the words "THE WORLD NEEDS GOD" above entrance to county courthouse); *Washegesic v. Bloomingdale Pub. Schs.*, 33 F.3d 679, 681 (6th Cir. 1994) (painting of Jesus Christ in public school hallway); *Gonzales v. N. Twp. of Lake Cnty.*, 4 F.3d 1412, 1414 (9th Cir. 1993) (crucifix in public park); *Ellis v. City of La Mesa*, 990 F.2d 1518, 1520 (9th Cir. 1993) (giant crosses on public land and on city insignia); *Murray*, 947 F.2d at 149 (cross on city seal); *Hewitt v. Joyner*, 940 F.2d 1561, 1562-63 (9th Cir. 1991) (religious statues in public park); *Harris v. City of Zion*, 927 F.2d 1401, 1402 (7th Cir. 1991) (crosses on city seal); *Freedom from Religion Found., Inc. v. Zielke*, 845 F.2d 1463, 1465 (7th Cir. 1988) (Ten Commandments in public park); *Saladin*, 812 F.2d at 688-89 (the word "Christianity" on city seal); *ACLU*

*of Ill. v. City of St. Charles*, 794 F.2d 265, 267 (7th Cir. 1986) (lighted cross on public property); *Hawley v. City of Cleveland*, 773 F.2d 736, 737 (6th Cir. 1985) (chapel in public airport); *Rabun Cnty.*, 698 F.2d at 1100-01 (lighted cross in a public park); *see also McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 851 (2005) ("large, gold-framed copies" of the Ten Commandments at county courthouses "posted in a very high traffic area of the courthouse" (internal quotation marks omitted)); *Van Orden v. Perry*, 545 U.S. 677, 681 (2005) (Ten Commandments monolith standing "6-feet high and 3 1/2-feet wide" in public park); *Cnty. of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 578 (1989) (crèche in county courthouse and menorah outside county building); *Lynch v. Donnelly*, 465 U.S. 668, 671 (1984) (crèche containing figures "ranging in height from 5 [inches] to 5 [feet]").[6] In each case, the plaintiffs alleged that they were deeply offended by the presence of the religious display on public property and sought its removal.

The courts consistently have applied the same general legal rules. A plaintiff has standing to challenge a religious display if he or she alleges a change in behavior (for instance, affirmative avoidance of the religious display). *Rabun Cnty.*, 698 F.2d at 1108. But, although an allegation of a change in behavior is sufficient to confer standing, it is not required. *Vasquez*, 487 F.3d at 1251-52; *Suhre*, 131 F.3d at 1087-88; *Foremaster v. City of St. George*, 882 F.2d 1485, 1490-91 (10th Cir. 1989); *Saladin*, 812 F.2d at 692-93.[7] A plaintiff also

---

[6]In the four cases following the "see also" indicator, I again list the cases in which the Supreme Court did not discuss standing but, rather, asserted jurisdiction over the Establishment Clause issue sub silentio. As explained above, *supra* note 4, sub silentio holdings on jurisdiction can present interesting challenges. But, here again, as with the cases noted in the preceding footnotes, the facts of the listed cases plainly establish that the standing requirements I discuss in text were met.

[7]The Seventh Circuit's position on this point is a bit uncertain. *Compare Zielke*, 845 F.2d at 1467 (suggesting that an allegation that the plaintiff

has standing when he or she has alleged "direct and unwelcome contact" with the religious display. *Grayson Cnty.*, 591 F.3d at 843; *Green*, 568 F.3d at 794; *Books*, 401 F.3d at 861; *City of Plattsmouth*, 358 F.3d at 1030; *accord Lefevre*, 598 F.3d at 642 ("unwelcome direct contact"); *Caldwell*, 545 F.3d at 1132 (same); *Vasquez*, 487 F.3d at 1253 (same); *Ashbrook*, 375 F.3d at 490 ("direct, unwelcome contact"); *Suhre*, 131 F.3d at 1088 ("direct unwelcome contact"). In the absence of "direct and unwelcome contact," however, a plaintiff cannot meet the standing requirements, even if he or she has contact with a religious display and is offended by it: "In certain cases, a plaintiff's contact with an allegedly offensive religious or anti-religious symbol will remain too tenuous, indirect, or abstract to give rise to Article III standing." *Vasquez*, 487 F.3d at 1251; *see also Caldwell*, 545 F.3d at 1132-33 (holding that the plaintiff's injury was insufficient for standing purposes because of the tenuous nature of the connection between a website user and the religious message on a webpage and because her contact with the web site was less forced than in *Vasquez*); *Cnty. of Montgomery*, 41 F.3d at 1161-62 (holding that a lawyer did not have standing to challenge a religious display in a courthouse where the lawyer had not alleged that he would have any contact with the display); *Washegesic*, 33 F.3d at 682 (noting that "psychological harm alone is not always a sufficient injury for standing purposes when contact [with a religious display such as a picture of Jesus Christ in a school's hallway] is indirect"); *Harris*, 927 F.2d at 1406 (holding that "the fact that the plaintiffs may be offended by the seals . . . does not confer standing").

___

altered behavior is necessary to establish standing), *with Cnty. of Montgomery*, 41 F.3d at 1161 (discussing *Zielke* and suggesting that its holding was not so broad); *see also City of Plattsmouth*, 358 F.3d at 1029 n.7 ("It appears likely the Seventh Circuit has disowned the 'altered behavior' test and distinguished this language contained in *Zielke*." (citing *Cnty. of Montgomery*, 41 F.3d at 1160-61)). At most, the Seventh Circuit constitutes a minority of one circuit.

A plaintiff who challenges a religious display meets the "direct and unwelcome contact" requirement by demonstrating some level of frequent or regular contact with the display during the course of the plaintiff's regular routine, such that the plaintiff was "forced" to encounter the display. For example, in *Vasquez*, 487 F.3d at 1251-52, the plaintiff challenged the existence of a cross on a county seal—which he encountered on a regular basis as a county resident *and* county employee. We held that the plaintiff had standing because he "held himself out as a member of the community where the seal is located, as someone *forced* into *frequent regular* contact with the seal, and perhaps most importantly, as someone 'directly affected' by his 'unwelcome direct contact' with the seal." *Id.* at 1251 (emphases added). We explained further:

> Unlike plaintiffs in *Valley Forge*, who were physically removed from defendant's conduct, Vasquez is a member of the community where the allegedly offending symbol is located, and his contact with the symbol was *frequent and regular*, not sporadic and remote. In fact, . . . the offending symbol "will be displayed on county buildings, vehicles, flags, stationary [sic], forms, commendations, uniforms, and elsewhere through LA County," thereby *forcing* Vasquez into *unwelcome* "daily contact and exposure" of the most pervasive kind. These facts and allegations make Vasquez's status fundamentally different from that of plaintiffs in *Valley Forge*.

*Id.* at 1252 (emphases added).

As another example, in *Suhre*, 131 F.3d at 1084-85, the plaintiff challenged a display of the Ten Commandments in the main courtroom of the county courthouse. The Fourth Circuit held that the plaintiff had standing because of his regular visits to that courtroom, both as a *frequent* litigant and as a participant in local government meetings (as a plaintiff and witness in past civil actions, as a defendant in criminal

actions, and as an attendee at four past meetings of local government). *Id.* at 1090. The court found it relevant that the plaintiff "*must confront* the religious symbolism whenever he enters the courtroom on either legal or municipal business." *Id.* (emphasis added).

*Vasquez* and *Suhre* are but two examples: In all other cases, too, the courts have held that the plaintiff has standing because of some level of regular or frequent contact with the religious display during the course of the plaintiff's routine business. *See, e.g.*, *Lefevre*, 598 F.3d at 642 (the plaintiff encounters the national motto on "coins and currency in everyday life" which "*forces him repeatedly* to encounter a religious belief he finds offensive" (emphasis added)); *Green*, 568 F.3d at 793-94 (the plaintiff visits the courthouse "on a weekly basis" for business and avocational purposes and "cannot avoid" the religious display); *O'Connor*, 416 F.3d at 1223 (the plaintiff professor and student "were *frequently* brought into direct and unwelcome contact" with a religious display "at a prominent location on campus" (emphasis added)); *Ashbrook*, 375 F.3d at 489-90 (the plaintiff "who travels to and *must* practice law within [the relevant] courtroom from time to time" and who "*has and would continue to come into direct, unwelcome contact* with the Ten Commandments display, the removal of which would, no doubt, prevent further injury to him" (emphases added)); *Glassroth*, 335 F.3d at 1292 ("The three plaintiffs are attorneys whose professional duties *require* them to enter the Judicial Building *regularly*, and when they do so they *must* pass by the monument." (emphases added)); *Saladin*, 812 F.2d at 692 (the plaintiffs "*regularly* receive correspondence on city stationery bearing the seal [that contains the word 'Christianity']" (emphasis added)); *see also Twp. of Wall*, 246 F.3d at 266 (noting that it was relevant whether the plaintiff visited a holiday display only "to describe the display for this litigation or whether, for example, he observed the display in the course of satisfying a civic obligation").

To be sure, courts have "recognized that '[t]he practices of our own community may create a larger psychological wound than someplace we are just passing through.' " *Suhre*, 131 F.3d at 1087 (alteration in original) (quoting *Washegesic*, 33 F.3d at 683). Accordingly, "where there is a personal connection between the plaintiff and the challenged display in his or her community, standing is more likely to lie." *Id.*; *see also City of Plattsmouth*, 358 F.3d at 1030 ("That the injuries are caused by [the plaintiff's] own City is all the more alienating."); *City of St. Charles*, 794 F.2d at 268 ("Maybe it ought to make a difference if . . . a plaintiff is complaining about the unlawful establishment of a religion by the city, town, or state in which he lives."). But no court has adopted a per se rule that the location of a religious display in the plaintiff's hometown or home state automatically confers standing on the plaintiff. *See Suhre*, 131 F.3d at 1087 (holding that, where the display is in the plaintiff's community, "standing is *more likely* to lie" only "where there is a *personal connection* between the plaintiff and the challenged display" (emphases added)); *Rabun Cnty.*, 698 F.2d at 1107 (holding that the location of the display in the plaintiffs' home state was one of several relevant "factors"). As in all cases, even when the religious display is in the plaintiff's hometown, the plaintiff must establish direct and unwelcome contact with the display. *See, e.g.*, *Suhre*, 131 F.3d at 1090 (determining whether the plaintiff has the requisite direct and unwelcome contact with the display, even though the display is located in the plaintiff's municipality).

Finally, the injury arises not purely from the psychological harm of viewing the display, but from the *consequence* of that harm. That is, a plaintiff's negative reaction to a religious display on public property interferes with the plaintiff's right to " 'freely use public areas.' " *Ellis*, 990 F.2d at 1523 (quoting *Hewitt*, 940 F.2d at 1564); *accord Ouachita Parish*, 274 F.3d at 292 ("use or enjoyment of a public facility"); *City of Eugene*, 93 F.3d at 619 n.2 ("freely using the area on and around [the public park]"); *Gonzales*, 4 F.3d at 1417 ("full use

and enjoyment of the public park"); *Hawley*, 773 F.2d at 740 ("impairment of their beneficial use of a public facility which they frequently use"). "We have repeatedly held that inability to unreservedly use public land suffices as injury-in-fact. Such inhibition constitutes 'personal injury suffered . . . *as a consequence* of the alleged constitutional error,' beyond simply 'the psychological consequence presumably produced by observation of conduct with which one disagrees.' " *Buono*, 371 F.3d at 547 (citations omitted) (ellipsis in original) (quoting *Valley Forge*, 454 U.S. at 485); *see also Barnes-Wallace*, 530 F.3d at 784 ("As in *Buono*, [the plaintiffs] have alleged injuries beyond 'the psychological consequence presumably produced by observation of conduct with which they disagree,' because their inhibition interferes with their personal use of the land." (brackets omitted) (quoting *Valley Forge*, 454 U.S. at 485)).

B.   *Resolution No. 168-06 and Alleged Harm to Plaintiffs*

Plaintiffs challenge Resolution No. 168-06. They allege that the resolution "attacks [their] deeply held religious beliefs," "stigmatizes Plaintiffs on account of their religious beliefs," and "sends a clear message . . . that they are outsiders, not full members of the political community." Plaintiffs allege that, as residents of San Francisco and members of the Catholic Church, the resolution "chill[s] their access to the government." "As a result of [the] resolution, Plaintiffs . . . will curtail their activities to lessen their contact with Defendants, thereby causing further harm."

In some ways, Plaintiffs' allegations evince a much stronger connection to the challenged governmental action than the plaintiffs' allegations in *Valley Forge*. The plaintiffs in *Valley Forge* had never visited, and had no other connection to, the land in question. Here, Plaintiffs reside in San Francisco, and Defendants operate as the San Francisco municipal government. There is no geographical separation. Additionally, Plaintiffs view the resolution as a direct attack

on their specific religion: Catholicism. There may be some stronger connection to the challenged government action when the action is perceived as a direct attack on one's own religion, as distinct from a more general offense that the government is condoning or conveying religious messages with which one generally disagrees or to which one does not adhere. I acknowledge that Plaintiffs' residency and their perception of the government action as attacking their specific religion distinguish this case in significant ways from the Supreme Court's *Valley Forge* decision.

In other ways, however, the allegations in the complaint suggest that Plaintiffs are more akin to "concerned bystanders," *Valley Forge*, 454 U.S. at 473 (internal quotation marks omitted), who have suffered no injury "other than the psychological consequence presumably produced by observation of conduct with which one disagrees," *id.* at 485. The parties do not dispute that the resolution is entirely non-binding and that it has no legal effect. It confers no benefits or legal rights. It imposes no obligations or responsibilities on anyone. It alters no government process, ordinance, or plan. In short, it does not *do* anything, other than to "urge" Cardinal Levada to withdraw his directive concerning Catholic Charities' adoption policies. This hortatory resolution is like precatory text in a statute's preamble, which plaintiffs lack standing to challenge unless the text applies to them "in some concrete way." *Webster v. Reprod. Health Servs.*, 492 U.S. 490, 506 (1989); *see also id.* at 504-07 (discussing this issue generally).

As discussed above, Plaintiffs are not the first to challenge a governmental policy or provision.[8] And, as discussed above,

---

[8]The majority opinion incorrectly asserts that I conclude that this case does not involve a challenge to a governmental policy or provision. Maj. op. at 17369-70 n.26. To the contrary, Plaintiffs here challenge a resolution enacted by Defendants, and I agree completely with the majority that "an official resolution of the City of San Francisco is indeed a case involving a specific governmental policy." *Id.* (internal quotation marks and

the courts have developed consistent requirements for establishing standing: In order to establish standing, Plaintiffs must allege that the provision applies to them in some direct and concrete manner. Plaintiffs' allegations here do not suffice.

Plaintiffs do not, and could not, claim that they are subject to the provisions of the non-binding resolution. They do not claim to be subject to the government's action—the "urging" of Cardinal Levada to retract his earlier directive. Instead, they claim harm from the "message" that the resolution's terms "sends" to Plaintiffs. I agree with the District of Columbia Circuit that, "[w]hen plaintiffs are not themselves affected by a government *action* except through their abstract offense at the *message* allegedly conveyed by that action, they have not shown injury-in-fact to bring an Establishment Clause claim." *In re Navy Chaplaincy*, 534 F.3d at 764-65.

Plaintiffs here have expressed their deep and genuine offense. Their status as Catholics and San Francisco residents distinguishes their concerns, at least to some extent, from the concerns of others who may view the resolution as offensive. In the end, however, the resolution carries no legal effect and, perhaps most importantly, does not apply to Plaintiffs.

Plaintiffs effectively ask us to hold that any person has standing to challenge any governmental action on Establishment Clause grounds, so long as the plaintiff resides within the government's territory and is offended by the action's alleged attack on the plaintiff's religion. As discussed above, in Part A, a governmental action within one's own community suggests that standing is more likely to lie. But the courts

_____

brackets omitted). In text, I apply, as we must, the clear standing requirements that we and other courts have developed in cases involving challenges to governmental policies. The majority opinion fails even to acknowledge those requirements or, in large degree, even the relevant cases.

have declined to apply a per se rule that those who reside within the geographic boundaries of the government automatically have standing to challenge the government's actions. Instead, the courts have required a showing that the challenged action actually affects these particular plaintiffs. Resolution No. 168-06 simply does not apply to Plaintiffs.

Nor does the fact that Plaintiffs perceive the resolution as a direct attack on their specific religion suffice to meet the "particularized" requirement.[9] In that regard, Plaintiffs' claims here are indistinguishable from the plaintiffs' claims in *Flora*, 692 F.2d at 54. There, the atheist plaintiffs, who resided in Arkansas, challenged a state constitutional provision that barred atheists from certain civic opportunities. *Id.* The Eighth Circuit held that, unless the plaintiffs could demonstrate that they had been, or would be, actually subject to the provision (which they could not), the plaintiffs lacked standing. *Id.* Citing *Valley Forge*, the court rejected the plaintiffs' theory that, "as atheists, they have suffered adverse psychological consequences as a result of the continued presence of this section in the Arkansas Constitution." *Id.* Like the Arkansas atheists in *Flora*, the San Francisco Catholics here cannot demonstrate that they are subject to the challenged provision, even though they allege adverse psychological consequences as a result of

---

[9]It is easy to overstate this distinction. A person who adheres to a religion other than, for example, Christianity may perceive the government's placement of a cross on a hill as a direct negative attack on that person's non-Christian religion, rather than as an affirmative endorsement of Christianity. Precisely for this reason, the courts have treated an endorsement and a disapproval as two sides of the same coin in the Establishment Clause context. *See, e.g.*, *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring) ("Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community. Disapproval sends the opposite message."). Similarly, an atheist might view the national motto, "In God We Trust," as an attack on his or her religious beliefs. But that fact is insufficient to confer standing. *Lefevre*, 598 F.3d at 643. I therefore decline to attribute much significance to this distinction for standing purposes.

the resolution's passage. Accordingly, Plaintiffs do not have standing.

The same analysis applies to our recent decisions involving atheist plaintiffs' challenge to the national motto, "In God We Trust," *Lefevre*, 598 F.3d at 643, and to the inclusion of the words "under God" in the national pledge of allegiance, *Rio Linda*, 597 F.3d at 1016. In those cases, the plaintiffs challenged not only the federal statute declaring our national motto and the federal statute adding the words "under God" to our pledge of allegiance, but the plaintiffs *also* challenged the statutes and policies that required that the motto be inscribed on our coins and currency and that the pledge be recited in schools. *Lefevre*, 598 F.3d at 643; *Rio Linda*, 597 F.3d at 1016. We held that the plaintiffs lacked standing to challenge the first type of statute: the federal statute declaring our national motto, *Lefevre*, 598 F.3d at 643, and the federal statute adding the words "under God" to our pledge of allegiance, *Rio Linda*, 597 F.3d at 1016. The fact that a statute on the books made the plaintiff feel like a "political outsider[ ]" and "inflict[ed] a stigmatic injury" was "insufficient to confer standing." *Lefevre*, 598 F.3d at 643; *see also Rio Linda*, 597 F.3d at 1016 (holding that, "because the Pledge does not mandate that anyone say it, [the plaintiff] has no personal injury to contest its wording in the courts" and therefore lacks standing to challenge the federal statute declaring the pledge). By contrast, we held that the plaintiff *did* have "standing to challenge the statutes that require the inscription of the motto on coins and currency . . . given the ubiquity of coins and currency in everyday life," *Lefevre*, 598 F.3d at 642, and that plaintiff parents of schoolchildren *did* have standing to challenge the state statute and school district policy permitting teachers to lead students through recitation of the pledge of allegiance*, Rio Linda*, 597 F.3d at 1016. Those statutes had a direct effect on the plaintiffs.

Here, Plaintiffs challenge the resolution only. As in *Lefevre* and *Rio Linda*, Plaintiffs allege that the governmental action

makes them feel like political outsiders and stigmatizes them because of their religious beliefs. And, as in *Lefevre* and *Rio Linda*, those allegations are insufficient. Plaintiffs' contact with the resolution here is no greater than the plaintiffs' contact with the federal statutes at issue in *Lefevre* and *Rio Linda*.

In those cases, we held, of course, that the plaintiffs had standing to challenge *other* statutes and policies—those statutes that put the plaintiffs in direct and unwelcome contact with the religious statement or religious exercise. But, in this case, there are no such other statutes or policies and no such direct and unwelcome contact. Clearly, Defendants have in no way inscribed the resolution on an item of everyday life such that Plaintiffs must encounter it, and Defendants have in no way required Plaintiffs to participate in a daily recitation of the resolution. Plaintiffs' challenge is limited to the resolution itself, which sets forth Defendants' policy statement on a matter of concern to the City—the precise parallel to the federal statutes setting forth our national motto and pledge of allegiance. Just as the plaintiffs' deep offense at the national motto and pledge of allegiance could not confer standing, neither can Plaintiffs' deep offense at Defendants' resolution confer standing here.

In conclusion, Plaintiffs' allegations are, in all relevant respects, identical to the plaintiffs' allegations in our recent decisions in *Rio Linda* and *Lefevre* and to the plaintiffs' allegations in *Flora*. Just as the allegations in those cases were insufficient to confer standing, so too are Plaintiffs' allegations here.

The majority fails to grapple with our holdings in *Rio Linda* and *Lefevre*. In particular, our holding in *Lefevre*, 598 F.3d at 643, applies with equal force here: "Although [Plaintiffs] allege[ ] the [resolution] turns [Catholics] into political outsiders and inflicts a stigmatic injury upon them, an 'abstract stigmatic injury' resulting from such outsider status is insufficient to confer standing." The majority distinguishes those cases,

and all other precedent, only on the ground that this case involves an *unambiguous* condemnation of a specific religion, while previous ones involved "vague and general religiosity." Maj. op. at 17370 n.26. As an initial matter, despite the great number of previous decisions involving challenged governmental actions, the majority cites not a single one in which the ambiguity or plainness of the perceived condemnation or endorsement of religion is even mentioned by a reviewing court for purposes of the standing inquiry. I do not, of course, question that Plaintiffs view the resolution as an attack on their religion. Similarly, though, courts in previous cases have not questioned that the plaintiffs viewed the challenged governmental action as an attack on, or an endorsement of, a specific religion. Whether the members of the reviewing court perceive the alleged attack or endorsement as "plain" or "ambiguous" seems fraught with difficulty. And, in many of the cases I have cited, I see no ambiguity. For example, the statute declaring our motto as "In God We Trust" is an unambiguous endorsement of theistic religions at the expense of the beliefs of atheists. Similarly, the placement of a cross on a city's seal is an unambiguous endorsement of Christianity at the expense of non-Christian religions. Yet, in *Lefevre* and *Vasquez*, and in all our other previous cases, the ambiguity or plainness of the challenged governmental action played no part in the analysis of standing.

Plaintiffs next argue, by way of analogy, that the resolution is similar to a religious display. They contend that, because they have been exposed to the "display," they have alleged sufficient "contact" with the "display" to constitute an injury in fact. The complaint does not allege the manner in which Plaintiffs encountered the resolution or the form of "display" to which Plaintiffs object, but it appears that Plaintiffs mean that they have read the resolution. That fact does not confer standing.

To begin with, the resolution is *not* a display; it is an act (albeit a non-binding act) of a legislative body. Had Defen-

dants reproduced the resolution, for example, in giant letters above the entrance to City Hall, *Cnty. of Montgomery*, 41 F.3d at 1158, or chiseled the resolution into a block of stone eight feet tall and three feet wide in a public park, *Green*, 568 F.3d at 789-90, the resolution's representation *in those forms* would constitute a religious display. As it is, though, the complaint fails to allege that this resolution has received greater prominence than any other. The resolution was posted, like every other resolution, on Defendants' website. *See* http://www.sfbos.org/ftp/uploadedfiles/bdsupvrs/resolutions 06/r0168-06.pdf.

The mere existence of an enactment on the books (or virtual books) is not enough. In the religious display context, a plaintiff has standing when he or she encounters the display with some level of frequency or regularity during the course of the plaintiff's typical routine. It is that "direct and unwelcome contact" with the display that confers standing on the plaintiff. Here, Plaintiffs read the resolution. But apart from that initial contact, Plaintiffs allege no facts to suggest that they ever would have reason to read the resolution again, as part of their regular routine or otherwise (except to facilitate this litigation). In summary, even if I construed the resolution as a religious display, which it is not, Plaintiffs could not meet the "direct and unwelcome contact" requirement that courts consistently have applied in religious display cases.

In this regard, our recent decision in *Caldwell*, 545 F.3d 1126, is instructive. There, the plaintiff objected to a webpage on a government website. *Id.* at 1128. The plaintiff argued that,

> like the plaintiffs in [religious display] cases, she also came into direct contact with a religious symbol on property owned by the government which she finds offensive; and that, just as the inability of plaintiffs in those cases freely to use public land sufficed as injury in fact, so too should it suffice that

she is inhibited from freely using a government
resource without running into religious symbols and
theological statements which offend her.

*Id.* at 1131. We rejected her argument, because her interest in
using the website was no different than anyone else's: Her
interest was "not sufficiently differentiated and direct to con-
fer standing on her . . . . An interest in informed participation
in public discourse is one we hold in common as citizens in
a democracy." *Id.* at 1133. Judge Fletcher wrote separately "to
elaborate more fully why Caldwell lacks standing." *Id.* (B.
Fletcher, J., concurring). Judge Fletcher held that the plaintiff
could not establish an injury in fact because:

> Caldwell also does not allege that her contact with
> the offensive views expressed on the [government]
> website was "frequent and regular" or "unwelcome."
> [*Vasquez*, 487 F.3d at 1251-52]. There is no allega-
> tion that Caldwell had any reason to visit the offend-
> ing web page more than once. Nor did the single
> offending web page prevent Caldwell from freely
> using the rest of the [Understanding Evolution] web-
> site: the site comprises approximately 840 pages,
> each of which can be viewed without having first
> viewed the offending page.

*Id.* at 1134 (one citation omitted).

   The same reasoning—of both the opinion and the
concurrence—applies here. Plaintiffs' interest in reading the
resolutions of their municipal government is no different than
anyone else's interest and, therefore, "is not sufficiently dif-
ferentiated and direct to confer standing." *Id.* at 1133. Addi-
tionally, Plaintiffs here do not allege that their contact with
the resolution was anything more than a one-time occurrence,
and "[t]here is no allegation that [Plaintiffs] had any reason to
visit the offending web page more than once." *Id.* at 1134 (B.
Fletcher, J., concurring). In sum, Plaintiffs' allegations do not

constitute an injury "other than the psychological conse-
quence presumably produced by observation of conduct with
which one disagrees." *Valley Forge*, 454 U.S. at 485. Plain-
tiffs therefore lack standing.

Plaintiffs next protest that their allegations constitute more
than pure psychological harm, because they also allege that
Defendants' abuse of power has "chill[ed] their access to the
government. As a result of [the] resolution, Plaintiffs . . . will
curtail their activities to lessen their contact with Defendants,
thereby causing further harm." Plaintiffs refer us to cases in
which courts have held that plaintiffs have standing because
of an affirmative change in behavior to avoid a particular reli-
gious display. *See, e.g.*, *Ellis*, 990 F.2d at 1523 (holding that
the plaintiffs have standing because they allege that they
avoid a public park where a cross is located). Plaintiffs argue
that, like the plaintiffs in those cases who avoided public
lands to avoid a religious display, Plaintiffs here have stand-
ing because their access to government has been "chill[ed]"
and they "will curtail their activities to lessen their contact
with Defendants." I am unpersuaded.

Plaintiffs' allegations suffer from lack of specificity. It is
unclear, for instance, when Plaintiffs "will" curtail their activ-
ities. It also is unclear what contacts Plaintiffs maintain with
Defendants and how, if at all, they "will curtail their activities
to lessen [that] contact." These vague allegations are a far cry
from the allegations sufficient to confer standing in religious
display cases, in which the plaintiff alleges that he or she reg-
ularly sees the offending display and explains how his or her
normal routine has changed so as to avoid those encounters.
*See, e.g.*, *City of St. Charles*, 794 F.2d at 269 (holding that
one plaintiff has standing because "she detours from her
accustomed route to avoid the [lighted] cross"); *see also
Mann v. City of Tucson*, 782 F.2d 790, 793 (9th Cir. 1986)
(per curiam) ("Although we must, in general, accept the facts
alleged in the complaint as true, wholly vague and conclusory
allegations are not sufficient to withstand a motion to dis-

miss.”); *Vasquez*, 487 F.3d at 1249 n.4 (noting that the district court disregarded an allegation that the plaintiff had “altered his behavior,” but declining to decide the issue because other allegations sufficed to confer standing (brackets omitted)). Moreover, if Plaintiffs’ vague allegations of some unspecified avoidance of governmental entities were sufficient to confer standing to challenge a proclamation of that governmental entity, then any plaintiff residing within the boundaries of the governmental body could satisfy the “injury in fact” requirement simply by alleging, in general, a threatened curtailment of activities with the governmental entity. No court has accepted such a sweeping proposition. *Cf. Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) (“Allegations of a subjective ‘chill’ are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; the federal courts established pursuant to Article III of the Constitution do not render advisory opinions.” (internal quotation marks omitted)).

Plaintiffs also point to the primary reason for the standing doctrine: “ ‘The essence of the standing inquiry is whether the [plaintiffs] have alleged such a personal stake in the outcome of the controversy *as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions*.’ ” *Larson*, 456 U.S. at 238-39 (emphasis added) (quoting *Duke Power*, 438 U.S. at 72). Plaintiffs contend that their deep opposition to the resolution is patent and genuine and that their determined adverseness to the resolution satisfies the basic purpose of the standing doctrine: They are fervent advocates who provide a sharp presentation of the issues.

I do not question the commitment of Plaintiffs to this case or the skill with which they have presented, and undoubtedly would continue to present, the issues. But the Supreme Court expressly has rejected passion as a substitute for Article III standing. “[S]tanding is not measured by the intensity of the

litigant's interest or the fervor of his advocacy. '[T]hat concrete adverseness which sharpens the presentation of issues,' *Baker v. Carr*, 369 U.S. [186,] 204 [1962], is the anticipated consequence of proceedings commenced by one who has been injured in fact; it is not a permissible substitute for the showing of injury itself." *Valley Forge*, 454 U.S. at 486; *see also Smelt*, 447 F.3d at 685 ("Motivation alone is not enough [to satisfy standing requirements].").

Plaintiffs also suggest that they must have standing to challenge the resolution because, if they do not have standing, no one would have standing, and that result cannot be correct. I disagree with Plaintiffs' major premise and their minor premise. It is a bedrock principle that the federal courts are courts of limited jurisdiction. A wide variety of doctrines, including standing, prevent us from hearing cases—even otherwise meritorious cases—because of the constitutional limits on our authority. As a general matter, I simply cannot accept an argument that begins with the premise that the federal courts *must* have jurisdiction over a dispute. More specifically, the Supreme Court has roundly rejected Plaintiffs' argument in this very context: " 'The assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing.' " *Valley Forge*, 454 U.S. at 489 (alteration omitted) (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974)).

Perhaps most importantly, however, Plaintiffs are wrong to suggest that, if they lack standing, then it is clear that no one would have standing to challenge the resolution at issue. To the contrary, it is likely that the parties who are personally the subjects of the resolution, such as Cardinal Levada, Archbishop Niederauer, and Catholic Charities, could demonstrate cognizable harm. The record is silent as to why those parties have not joined as plaintiffs. But their interests, which likely *are* directly affected, matter. "The Art. III aspect of standing . . . reflects a due regard for the autonomy of those persons likely to be most directly affected by a judicial order." *Valley*

*Forge*, 454 U.S. at 473; *see also id.* at 489-90 (holding that the Court was "unwilling to countenance" a theory whereby "[t]he existence of injured parties who might not wish to bring suit becomes irrelevant"). For Plaintiffs, however, the resolution carries no legal or direct, particularized, concrete, or practical effect. Accordingly, Plaintiffs cannot establish "injury in fact."[10]

Plaintiffs lack standing because no individual Plaintiff can establish "injury in fact." For that reason and because the complaint fails to allege that any party directly targeted by the resolution is a member of Catholic League, Catholic League likewise lacks associational standing. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977) (holding that, to establish associational standing, an organization must,

---

[10]Although we need not reach the issue, we note in addition that Plaintiffs almost certainly cannot satisfy the "redressability" requirement. *Lujan*, 504 U.S. at 560-61. The resolution exists; it is on the books; and it is an expression of the policy preferences of San Francisco. This court is powerless to change the opinion of the Board of Supervisors on the subject of same-sex adoptions. Even if we declared the resolution unconstitutional, the only real effect of that declaration on Plaintiffs would be to make Plaintiffs happy. Just as the negative psychological consequence of the government's action is insufficient to satisfy the "injury in fact" requirement, the positive psychological consequence of the court's action is likewise insufficient to satisfy the "redressability" requirement. Hints of this aspect of redressability are found within the case law. *See, e.g.*, *Ashbrook*, 375 F.3d at 489-90 (holding that the plaintiff "has and would continue to come into direct, unwelcome contact with the [religious] display, the removal of which would, no doubt, prevent further injury to him"); *Glassroth*, 335 F.3d at 1292-93 ("[A] favorable decision will likely redress [the plaintiffs'] injuries. If [the defendant] is required to remove the [religious display] from the public area of the Judicial Building, the plaintiffs will no longer have to observe it or take actions to avoid going into the building."); *Ouachita Parish*, 274 F.3d at 293 ("[I]t is certain that a finding of unconstitutionality would redress the plaintiffs' injury, as it would . . . end[ ] the practice of verbal prayer in their schools."); *see also Doremus*, 342 U.S. at 433 (holding that the plaintiffs could not maintain suit because the student had graduated from the public school and "no decision we could render now would protect any rights she may once have had").

among other things, demonstrate that its members would otherwise have standing to sue in their own right).

### C.  *Municipal Taxpayer Standing*

Plaintiffs also allege that they are municipal taxpayers of San Francisco and that they "have been injured by the abuse of government authority and the misuse of the instruments of government to criticize, demean, and attack their religion and religious beliefs."[11] Plaintiffs do not allege any specific expenditure of public funds, and none is apparent from the record. That being so, Plaintiffs cannot establish taxpayer standing. *See Doremus*, 342 U.S. at 433 (holding that municipal taxpayers do not have standing because "[t]here is no allegation that this [government-sponsored] activity is supported by any separate tax or paid for from any particular appropriation or that it adds any sum whatever to the cost of conducting the school"); *id.* at 434 ("It is apparent that the grievance which it is sought to litigate here is not a direct dollars-and-cents injury but is a religious difference."); *Barnes-Wallace*, 530 F.3d at 786 (holding that "municipal taxpayers must show an expenditure of public funds to have standing" (citing *Madison*, 177 F.3d at 793-97)).

### CONCLUSION

I recognize that the failure to reach an important, disputed constitutional issue leaves something to be desired. But I cannot ignore the constitutional bounds of our jurisdiction: "Article III, which is every bit as important in its circumscription of the judicial power of the United States as in its granting of that power, is not merely a troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit which

---

[11]Although Plaintiffs have never argued that they have standing as municipal taxpayers, we must consider our jurisdiction independently of a party's arguments. Because they allege in the complaint that they are taxpayers of San Francisco, I address municipal taxpayer standing.

a party [or, as the case may be, both parties] desires to have adjudicated . . . ." *Valley Forge*, 454 U.S. at 476. We lack subject matter jurisdiction. I therefore concur in the judgment affirming the district court's order dismissing the complaint.